UNITED STATES of America, Plaintiff,

v.

Joseph R. GREGG, Ruby C. McDaniel, Luis Menchaca, Francis S. Pagnanelli, William Charles Raiser, Michael Henry, Rose Kidd, Arnold Matheson, Katharine O'Keefe, Eva Alvarado, Joseph F. O'Hara, Joseph Roach, Robert Rudnick, James Soderna, James Sweatt, Elizabeth Wagi, Byron Adams, Kevin Blake, Amy Boissonneault, Baldo Dino, Stephen C. Elliot, Sheryl Fitzpatrick, Mary Foley, Dennis Green, George Lynch, Raymond Micco, Alexis Mulrenan, Ralph Traphagen, James Trott, Kimiko Trott, Defendants.

No. CIV. A. 97–2020 (JCL).

United States District Court,
D. New Jersey.

Dec. 11, 1998.

Shelley Jackson, Trial Attorney, U.S. Dept. of Justice, Civil Rights Division, Special Litigation Section, Washington, DC, Colette R. Buchanan, Assistant U.S. Attorney, U.S. Department of Justice, United States Attorney, District of New Jersey, Newark, NJ, for Plaintiff.

Edward J. Gilhooly, Morristown, NJ, Richard Traynor, Morristown, NJ, Michael Pelletier, Chester, NJ, Josephine A. Farrell–Betz, Mendham, NJ, William Broderick, Pequannock, NJ, Peter Burke, Summit, NJ, William C. Cagney, Lane & Mittendorf, LLP, Iselin, NJ, Donald D. Campbell, Berkeley Heights, NJ, Michael Patrick Carroll, Morristown, NJ, Ralph Coti, Herriot, Coti & Sugrue, New York City, Michael O. Cummings, Morgan & Finnegan, LLP, New York City, Terence J. Gallagher, Morristown, NJ, Estelle Flynn Lord, Westfield, NJ, David Oakley, Anderl & Oakley, PC, Princeton, NJ, Juan J. Ryan, New Providence, NJ, Thomas E. Shields, III, Wayne, NJ, Gregory J. Sullivan, Hartsough & Kenny, Hamilton, NJ, Stephen C. Elliot, Newark, DE, Sheryl Fitzpatrick, Brighton, MA, for Defendants.

## MEMORANDUM AND ORDER ENTERING FINAL JUDGMENT

LIFLAND, District Judge.

Presently before the Court is the motion of the United States of America (hereinafter "United States") for summary judgment pursuant to *Fed.R.Civ.P.* 56(a) on all claims alleged in its Complaint. For the reasons set forth herein, the motion of the United States will be granted, and appropriate relief will be awarded.

### BACKGROUND

On April 18, 1997, the United States, through the Attorney General, filed this action pursuant to the Freedom of Access to Clinic Entrances Act (hereinafter "FACE" or "the Act"), 18 U.S.C. § 248 (1994). The Complaint alleges that Metropolitan Medical

Associates (hereinafter "MMA"), its employees and persons seeking reproductive services at MMA, have been and may continue to be injured by conduct constituting violations of FACE. The Complaint was filed to ensure that (a) the named defendants are enjoined from committing future violations of FACE and (b) that statutory damages, as provided for under FACE, are imposed on defendants for violations of the Act.

On December 22, 1997, this Court issued a preliminary injunction prohibiting the named defendants from physically interfering with or obstructing access to the MMA building and facilities, physically intimidating or attempting to intimidate anyone seeking access to the MMA building and facilities, and entering on or being located on or within the premises of the MMA building and facilities, unless seeking reproductive health services. The Court denied the United States' request for a 60-foot buffer zone. The Court issued its Findings of Facts and Conclusions of Law after the preliminary injunction hearing. The following facts are undisputed unless otherwise noted.[1]

MMA is a reproductive health care clinic that provides ambulatory care abortions and related services. MMA is located in a two-story building at 40 Engle Street, Englewood, New Jersey. MMA has a street-level front entrance, directly adjacent to a public sidewalk. MMA patients and their visitors generally park on the street or in nearby parking lots, and walk down the Engle Street sidewalk to the clinic. MMA also has a small parking lot, which is used by staff only and is accessed by an alley to the side of the clinic building.

Persons entering MMA from the street must proceed past a first-floor security station and up a stairway to the second floor, through double glass doors, where the waiting room and reception area are located. Patients must register at the second floor reception desk and remain in the waiting room until called to the office area for an examination, laboratory tests and, in some cases, counseling. After counseling, patients who undergo medical procedures walk back down the stairway to the medical area on the first floor. The stairway between the first and second floors is the only one routinely used by patients or staff. The first floor street entrance is the only regularly used method for patients to enter and exit MMA. An emergency fire escape is located at the rear of the MMA building, near the staff parking lot.

Anti-abortion protests and demonstrations at MMA are restricted pursuant to orders issued in 1974 by the Superior Court of New Jersey. These orders require, *inter alia*, that protestors remain on the eastern side of Engle Street, across the street from the clinic. The distance from the front door of MMA across Engle Street to the eastern side of the street is approximately 60 feet.

Three blockades occurred at MMA between August 1996 and March 1997. A fourth blockade of MMA was attempted in April 1997.

### August 7, 1996 Blockade of MMA

On August 7, 1996, five of the named defendants—Joseph Gregg, Ruby McDaniel, Luis Menchaca, Franco Pagnanelli and William Raiser—blocked access to MMA by placing themselves inside the clinic building on the second floor landing in front of the clinic's patient waiting room entrance and office area, completely blocking the staircase. The five defendants were seated in two groups, one group of three and one group of two individuals. They had locked themselves together with U-shaped bicycle locks. The bicycle locks were placed around each of their necks and then linked together. Defendants McDaniel and Pagnanelli were locked together in one group; the other three defendants were locked together in a second group. At the preliminary injunction hearing, Englewood Police Officers George Wathney and Steven Sabo were able to identify

---

1. In their Opposition Brief, defendants state "In face of the videotapes and some of the uncontradicted testimony [at the preliminary injunction hearing], we will not spend a great deal of time in disputing the facts that pertained to August 7, 1996, January 18, 1997, March 15, 1997, or for that matter, the April 19, 1997, events." Def. Opp. Br. at 9. Defendants instead dispute facts concerning the additional relief sought by the United States in the form of a 60-foot buffer zone and statutory damages.

defendants Pagnanelli and McDaniel as the individuals pictured in Government Exhibit 4B. Tr. at 1.95–1.98, 1.128, 1.110, 1.128, 1.42–1.43, 1.112, 1.117; Govt. Exhs. 4A, 4B.

Numerous police officers and fire department personnel were required to respond to the blockade of MMA. The defendants refused to leave or unlock themselves in response to police requests to do so.

It took fire department personnel considerable time to cut through one set of locks on the defendants. Ultimately, they were unable to remove all of the locks on site. Two of the defendants, still locked together, had to be carried by police officers out of the clinic and to police vehicles.

During the blockade, access to MMA's second floor patient and office areas was completely blocked. Also during the blockade, defendants McDaniel and Pagnanelli, who were locked together, were inside the clinic when the door against which they were leaning was opened from the inside. Pagnanelli and McDaniel moved into the open doorway. Police officers had to forcibly remove these two defendants from the doorway so that the door could be closed. Also during the blockade, the defendants were, at times, loud and belligerent, yelling statements that expressed their opposition to abortion.

As a result of the blockade, some MMA staff members conducted themselves as if they were angry and shaken. Some acted intimidated by defendants' actions, by expressing desires to quit working at MMA.

All five individuals were arrested and charged with trespass and other violations.

*January 18, 1997 Blockade of MMA*

On January 18, 1997, twelve of the named defendants—Luis Menchaca, Michael Henry, Rose Kidd, Arnold Matheson, Katharine O'Keefe, Eva Alvarado, Joseph O'Hara, Joseph Roach, Robert Rudnick, James Soderna, James Sweatt and Elizabeth Wagi—blocked access to MMA by sitting or lying in front of the clinic building entrance on Engle Street. These defendants blockaded MMA despite the presence of police officers in their official vehicles directly in front of the clinic. Some defendants initially tried to enter the clinic and had to be forcibly kept out of the

clinic by MMA staff and police. The defendants refused to leave the clinic entranceway and had to be physically removed and carried away by police officers.

At the hearing, defendants put into evidence a videotape showing the blockade. The videotape showed individuals crossing Engle Street and sitting and/or lying in front of the clinic entrance. Defendants' Preliminary Injunction Hearing Exhibit ("Defs.Exh.") 1; Tr. at 2.155–2.156, 2.158–2.160, 2.162–2.164. The defendants were part of a crowd of demonstrators who were outside the clinic protesting against abortion, including yelling anti-abortion statements. The twelve blockaders were arrested and charged with trespass and other violations.

*March 15, 1997 Blockade of MMA*

On March 15, 1997, nineteen of the named defendants—Menchaca, Henri, Kidd, Matheson, O'Keefe, Byron Adams, Kevin Blake, Amy Boissonneault, Baldo Dino, Stephen Elliot, Sheryl Fitzpatrick, Mary Foley, Dennis Green, George Lynch, Raymond Micco, Alexis Mulrenan, Ralph Traphagen, James Trott and Kimiko Trott—blocked access to MMA by sitting or lying in front of the clinic building entrance on Engle Street. This blockade was conducted in two separate waves. The first group of blockaders ran across Engle Street, sat or lay in front of the entranceway, refused to leave when asked by police officers and had to be physically removed by the officers.

The second wave of blockaders ran across the street just as the officers had cleared the clinic's entrance area of the first group. Like the first group, the second group sat and lay in front of the entranceway, refused to leave when asked by police and had to be physically removed.

As the officers attempted to remove the blockaders on March 15, many of them physically resisted, locking arms and legs, holding onto each other and scrambling back toward the door each time the officers pulled them away.

At times, individuals seeking access to the clinic on March 15 were unable to enter MMA until the area around the clinic entrance was cleared by police. Officers es-

corted individuals, some of whom were angry, hysterical and crying, into the building.

The March 15 blockade caused one MMA patient concern over having to step over people to enter MMA.

One defendant, Arnold Matheson, kicked a police officer twice in the groin and attempted to "head-butt" the officer during the arrests.

The scene outside the clinic was chaotic and loud, with a crowd of anti-abortion demonstrators contributing to the chaos by yelling, including one demonstrator who yelled through a megaphone at police officers. The demonstrators carried anti-abortion signs and yelled anti-abortion slogans. The crowd of demonstrators cheered for the two waves of blockaders as they crossed the street and blocked the clinic entrance. The demonstrators also yelled at and berated police officers as they removed the blockaders.

Defendants carried out the March 15 blockade in spite of substantial law enforcement presence outside the clinic. In order to respond to defendants, Englewood police had to call for assistance from neighboring towns and municipalities. At some times during the March 15 blockade, police were forced to close Engle Street, a main thoroughfare, in order to better respond to the disturbance created by the defendants and demonstrators.

All nineteen defendants were arrested and charged with trespass and other violations. Five of the nineteen defendants had also participated in either the August 1996 or January 1997 blockades.

*April 19, 1997 Attempted Blockade of MMA*

On April 19, 1997, the day after this lawsuit was filed, numerous anti-abortion demonstrators attempted to blockade the clinic, including defendant Matheson. Despite police erecting police barricades and lining the street with police vehicles, these individuals ran across the street in more than one group, between and over police vehicles, in an effort to get to the entrance to MMA. Some demonstrators threw themselves under police vehicles, suffering cuts and scrapes. One demonstrator dove under a police van that was running and grabbed onto the underside, re-

quiring officers to crawl under the vehicle to pull him out. Police apprehended and arrested the demonstrators before they could reach the clinic entrance. These individuals were charged with trespass and other violations.

### STANDARD OF REVIEW

Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring the nonmoving party such that a reasonable

jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. 2505.

### DISCUSSION

Section 248(a)(1) of the Freedom of Access to Clinic Entrances Act provides:

(a) Prohibited Activities.—Whoever—

(1) by ... physical obstruction ... intentionally injures, intimidates, or interferes with or attempts to injure, intimidate, or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services ... shall be subject to the ... civil remedies provided in subsection (c) ....

18 U.S.C. § 248(a)(1).

■■■ FACE defines a physical obstruction as:

[R]endering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous.

18 U.S.C. § 248(e)(4). Entry into or invasion of the clinic, physical injury to clinic clients or staff, or the non-occurrence of scheduled procedures or abortions are *not* elements of an obstruction under FACE, and therefore, need not be demonstrated to establish a violation of the Act. *See United States v. Roach,* 947 F.Supp. 872, 876 (E.D.Pa.1996). Similarly, as long as access is made "unreasonably difficult or hazardous," it is not necessary to establish that there was absolutely no way to enter an abortion facility in order to prove a violation of the Act. *United States v. Soderna,* 82 F.3d 1370, 1377 (7th Cir.1996), *cert. denied sub nom, Hatch v. United States,* —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996) (finding that "unreasonably difficult" access in the context of FACE includes having to surpass such obstacles as individuals "lying down across the entrance so that the entrant has to step—or jump?—over the blockader" and instances in which "only one entrance of several (but that the main one) is blocked"); *United States v. Lindgren,* 883 F.Supp. 1321, 1328 (D.N.D.1995).

■■■ For purposes of FACE, "intent" means "intending to perform the act and aware of the natural and probable consequences of it." Legislative history of FACE, S. Rep. 103–117, 103rd Cong., 1st Sess. 24 n. 39 (1993) (hereinafter "S. Rep. 103–117"). To "interfere with" means "to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2).

■■■ It is clear from the undisputed facts that the United States has met its summary judgment burden of showing there is no genuine issue of material fact as to whether defendants violated § 248(a)(1) of FACE. The United States pointed to evidence indicating that on August 7, 1996, January 18, 1997, and March 15, 1997, defendants physically obstructed ingress to and egress from MMA, with the intent to interfere with, or in an attempt to interfere with, clinic staff and patients because those persons were seeking or providing reproductive health services. *See* Findings of Fact and Conclusions of Law.

### Physical Obstruction

As the Court has already recognized, defendants engaged in physical obstruction as defined by FACE during each of the blockades at issue in this case. The United States has established that defendants made ingress into MMA unreasonably difficult, in that persons seeking to enter MMA had to step or climb over the bodies of defendants as they blocked the entrances. These blockades constituted physical obstructions, as defined by FACE. Thus, the first element of a FACE violation has been established. Court's Findings and Conclusions at 20, ¶ 20. Defendants admit in their Opposition Brief that "On August 7, 1996, several of the defendants entered the premises and lay prone on the stairway and hallway.... On January 18, 1997, several defendants crossed the street in front of the clinic and blocked the front door of the clinic.... Again, on March 15, 1997, several of the defendants crossed the street and blocked the door." Thus, the United States has met its burden and there is no dispute as to this element.

*Intent to Interfere With Clinic Employees and Clients or Attempt to Do So*

Defendant's intent to interfere with MMA staff and patients is evident from their conduct. "Intent" means "intending to perform the act and aware of the natural and probable consequences of it." S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 24, n. 39, 1993 U.S.Code Cong & Admin. News (1993). In each of the blockades that are the subject of this lawsuit, the "natural and probable consequences" of defendants' action was that the freedom of movement of individuals seeking access to MMA would be restricted. At the hearing, the United States offered videotape and eyewitness testimony to show that the defendants, as well as numerous other individuals outside MMA on January 18 and March 15, 1997, yelled or uttered anti-abortion statements, including imploring women not to go into the clinic or not to kill their babies and carried anti-abortion signs. The United States also pointed to evidence showing that defendants refused to leave or move away from the clinic's entrance areas when repeatedly asked to do so by police officers during each of the three blockades. The Court found the requisite intent in the preliminary injunction hearing based on such evidence. The United States has met its burden for this element.

*Because the MMA Provides, and its Patients Obtain, Reproductive Health Services*

As stated above, defendants made statements that expressed their opposition to abortion during the blockade in August 1996. Similarly, in January and March of 1997, the record indicates that defendant's blockade took place in the midst of anti-abortion demonstrations. Based on such evidence the Court previously found that "defendant's actions on August 7, 1996, January 18, 1997, and March 15, 1997 were motivated by their desire to stop abortions from occurring." Findings and Conclusions at 21, ¶ 21. Thus, the United States has satisfied its burden for this element.

As the party responding to a motion for summary judgment, defendants bear the burden of "designat[ing] specific facts showing that there is a genuine issue for trial." *Country Floors, Inc. v. Partnership Com-*posed of *Gepner & Ford,* 930 F.2d 1056, 1061 (3d Cir.1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In their Opposition Brief, defendants do not dispute most of the facts that pertain to August 7, 1996, January 18, 1997, March 15, 1997, or April 19, 1997. *See* Opp. Br. at 9. Defendants do dispute a few of those facts and the "additional facts that the United States now brings forward" concerning the 60–foot buffer zone the United States seeks.

Defendants dispute whether patients were frightened or turned away or their access blocked to the clinic. Defendants suggest that the individuals who approached MMA's entrance when defendants blockaded the clinic were "phoney [sic] patients, used to deceive the court into granting an injunction." Opp. Br. at 12. The record contains no evidence in support of this argument. The only evidence defendants point to in support of their argument is the fact that the United States did not seek out the identity of three individuals whom the defendants purported to describe in an interrogatory. *See* Opp. Br. at 12–13. However, the fact that the United States has not identified certain individuals in whom defendants had an interest does not raise an issue of material fact as to obstruction.

Defendants also dispute the number of interior stairways in the MMA building. They state in their Opposition Brief that "Our recollection is that administrator Jones testified at the preliminary injunction hearing that there is no interior stairway." Opp. Br. at 11. However, the Court found in its Findings and Conclusions that "the [interior] stairway between [MMA's] first and second floors is the only one routinely used by patients and staff." *See* Findings and Conclusions, at 2, ¶ 3 (citing Tr. at 1.32, 1.37–1.38). Defendants do not point to specific evidence in the record indicating that there is no interior stairway.

Defendants also dispute that defendant Roach "and one or two other" defendants either intended to obstruct access to MMA or crossed the street to the entrance of the clinic. Defendants candidly admit, however, that as of the time they wrote their brief in

opposition to the United States' motion, they were unable to substantiate this claim with any reference to the record.[2] In fact, the record shows that defendant Roach admitted participating in the January 18, 1997 blockade of MMA. *See* Defendant's Responses to United States Requests for Admissions, Nos. 30–33, 36–41, 45. Because defendants have not pointed to specific evidence on this issue, and because the record supports plaintiff's conclusion, the Court finds there is no issue of material fact.

Thus, defendants have failed to meet their burden.

The Court finds that the United States is entitled to summary judgment that defendants have violated § 248(a)(1) of FACE. The rest of this case focuses on the appropriate remedies for such a violation. The United States seeks a permanent injunction broadening the relief granted in the Preliminary Injunction Order of 12/23/97 to include a 60–foot buffer zone, and seeks statutory damages.

*Permanent Injunction*

■ Defendants apparently contend that the United States is not entitled to permanent injunctive relief because defendants have not engaged in unlawful conduct since this case was filed, making the case moot.[3] In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Supreme Court described, in the context of a case brought under the Clean Water Act, the burden on a party when that party asks the court to dismiss a case as moot: "In seeking to have a case dismissed as moot ... the defendant's burden 'is a heavy one'.... The defendant must demonstrate that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66, 108 S.Ct. 376 (citing *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)); *Phillips v. Pennsylvania Higher Educ. Assistance Agency*, 657 F.2d 554 (3d Cir.1981). The only evidence that defendants put forth in this regard is that they have complied with the Preliminary Injunction. Defendants assert that their compliance with the Preliminary Injunction is a sufficient basis not only to deny the United States' permanent injunctive relief, but also to dismiss the case and vacate the terms of the prior injunction. Opp. Br. at 25.

■ Defendants have not met their "heavy" burden. They do not dispute that prior to the initiation of this lawsuit, they blockaded MMA, and that some defendants blockaded MMA on more than one occasion within a seven-month period. *See* Opp. Br. at 11; Stipulation of Facts at 3–6. Similarly, defendants do not dispute that many defendants have a history of obstructive and threatening conduct at abortion clinics, including the refusal to comply with injunctions and other lawful court orders designed to protect abortion providers.[4] *See* Stipulated Facts at 8–12. Finally, defendants continue to assert that their conduct did not violate FACE and that they should not be subjected to any legal consequences as a result of their actions. *See* Opp. Br. at 14. These facts indicate that the wrongful behavior of defendants could be reasonably expected to recur, and that a permanent injunction is necessary.

Furthermore, "an enjoined party ought not to be rewarded merely for doing what the court has directed." 11A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal

---

**2.** *See* Defendants' Opposition at 11, n. 1 (claiming that this exculpatory information exists, but stating that "[o]ur notes as to the location of theses [sic] [exculpatory] exceptions in the record are buried in our mass of papers.")

**3.** Although defendants' brief appears to dispute only the broadening of the preliminary injunction to include a 60–foot buffer zone (*see* Opp. Br. at 15–23), the last paragraph of the brief states that the "court ought to consider dismissing the matter or at least vacating the injunction and denying a final injunction." Thus, it ap-

pears that defendants dispute the entry of a permanent injunction even if on the same grounds as the preliminary injunction.

**4.** As pp. 8–12 of the Stipulated Facts indicate, defendants Blake, Boissonneault, Fitzpatrick, Gregg, Green, O'Hara, O'Keefe, Lynch, Matheson, McDaniel, Menchaca, Pagnanelli, Raiser, Roach, Soderna, Traphagen, and Wagi had each been involved in anti-abortion blockades prior to carrying out blockades at MMA.

Practice and Procedure, § 2961 at 405 (1995); *see also Walling v. Harnischfeger Corp.*, 242 F.2d 712, 713 (7th Cir.1957) (refusing to dissolve permanent injunction solely on the basis of defendants' compliance; finding that "[c]ompliance is just what the law expects"). "Voluntary cessation of allegedly illegal conduct does not deprive the tribunal of the power to hear and determine the case, i.e., does not make the case moot." *Phillips*, 657 F.2d at 568–69. Thus, the fact that Defendants have not engaged in obstructive behavior at MMA since the preliminary injunction was granted is not enough to convince the Court that there is no longer a need for the injunction.

Defendants' refusal to acknowledge the illegality of their conduct also prevents this case from being moot. The Supreme Court held in *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29 (1944), that a case was not moot when, despite voluntary compliance, "a controversy over the legality of the [challenged conduct] still remains." *See also Dow Chem. Co. v. U.S. EPA*, 605 F.2d 673, 679 (3d Cir.1979) (finding case not moot because defendant had not "altered its substantive stance" regarding the legality of the challenged conduct); *Donovan v. Cunningham*, 716 F.2d 1455, 1461 (5th Cir.1983) (stating that argument that "voluntary cessation does not constitute mootness is particularly true in the face of [defendants'] continued insistence that their discontinued activities were legal ... "), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Despite this Court's findings to the contrary, defendants continue to insist that FACE does not apply to them and that FACE is unconstitutional.

Defendants have not met their burden of proving that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66, 108 S.Ct. 376. In fact, the record indicates quite the contrary—that at least some of the defendants are likely to engage in the wrongful behavior. This is apparent from the fact that defendants continue to insist that their discontinued activities are legal and that many defendants have a history of obstructive and threatening conduct at

abortion clinics. Thus, the case is not moot and the Court will grant a permanent injunction to prevent defendants from violating FACE in the future.

*Scope*

█ This Court found in its Findings of Fact and Conclusions of Law at the Preliminary Injunction Hearing that the evidence submitted at the time of the hearing did not warrant a buffer zone. Findings of Fact and Conclusions of Law, at 31, ¶ 40. The Court stated:

> "The obstructive acts in evidence in this case took place inside of, or at the main entrance to, the MMA building. Accordingly, only the acts that are violative of the Access Act, and for which the evidence supports the imposition of a preliminary injunction, will be enjoined. The injunction will be limited to such obstructive acts."

*Id.*

The United States argues that a buffer zone is appropriate in light of many defendants' demonstrated intent to interfere repeatedly with the provision of abortions at MMA. The United States recounts facts where some defendants blockaded MMA despite having been enjoined or subjected to criminal penalties in other cases. The Court was aware of such facts in refusing the buffer zone at the preliminary injunction hearing. The Court once again rejects this argument based on the reasoning quoted above.

The United States also argues that a buffer zone is necessary due to the physical layout of the area in which MMA is located. Once again, the Court was aware of the layout at the preliminary injunction hearing when it denied the request for a buffer zone. No new facts have been alleged concerning the physical layout, and the Court rejects this argument.

The United States also argues that a buffer zone that gives law enforcement officers a definite, objective "bright line" by which to measure compliance would aid enforcement of the injunction. The United States puts forth deposition testimony of Lt. William Ryan and Deputy U.S. Marshal Blair Deem to this effect. Although this is certainly true,

the fact still remains that the obstructive acts took place inside of, or at the entrance to, the MMA building. There is no evidence to support an injunction for acts that might occur across the street. The Court will not broaden the injunction for the sole reason of creating a bright line to aid officers in enforcement, when the evidence does not support such a bright line.

Therefore, because the United States has produced no new evidence since the time of the preliminary injunction hearing that would serve as an adequate basis for a 60-foot buffer zone, the Court finds relief including such a buffer zone is not warranted in this case.

### Statutory Damages

██ 18 U.S.C. § 248(c)(1)(B) states, "With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." The court may award statutory damages by summary judgment when no material facts are in dispute. *Greenhut v. Hand,* 996 F.Supp. 372 (D.N.J.1998) (statutory damages awarded in Access Act lawsuit at summary judgment phase); *Milwaukee Women's Medical Servs. v. Brock,* 2 F.Supp.2d 1172 (E.D.Wis.1998) (court assessed statutory damages based on summary judgment motion). In filing this lawsuit, the United States requested that the Court impose a statutory damages award of $5,000 on each defendant for each time that defendant violated FACE. The parties disputed the proper interpretation of the civil remedies provisions of FACE, and the Court issued a Memorandum of June 18, 1998 resolving that dispute. The following analysis is based on the Memorandum of June 18, 1998.

The first dispute is whether the "$5,000 per violation" clause in 18 U.S.C. § 248(c)(1)(b) authorizes imposition of $5,000 in statutory damages per defendant participating in a given blockade-type violation of FACE, or whether that section authorizes only $5,000 per blockade, presumably to be shared by all defendants participating in such blockade. Two district court cases have addressed this precise question, and both of them resolved the issue in accordance with the contention of defendants here. *See Greenhut,* 996 F.Supp. at 379 (awarding $5,000 per violation); *Milwaukee Women's Medical Servs.,* 2 F.Supp.2d at 1178 (stating that FACE authorizes statutory damages in the amount of $5,000 per violation, not per defendant).

This Court also resolves the issue in accordance with the contentions of the defendants here, for the following reasons. The Court's starting point on any question of statutory interpretation is the language of the statute. Built into that language is a dichotomy of expression that this Court finds meaningful as to the intent of Congress. In authorizing compensatory "statutory damages," Congress used the phrase "per violation." The intent of Congress was to eliminate the usual burden of an aggrieved person to prove actual damages, and to authorize compensation to such person, in an amount which it felt to be fair and just, for interference with that person's right to obtain or provide reproductive health services. Such fair and just compensation does not depend on, or relate to, the number of defendants interfering with such a right. One person can just as effectively injure, interfere with, or intimidate as can a group, depending on the circumstances. Moreover, conduct not involved here, but subject to the same civil remedies, such as interference with religious freedom rights and damage to religious worship facilities, can be perpetrated by a single individual or by a group. Given those variables, in this Court's view, Congress chose to authorize compensatory statutory damages in a fixed amount regardless of the number of individuals participating in the violation. Moreover, being compensatory, the $5,000 award logically and legally relates to the injury suffered rather than to the number of perpetrators, and, as indicated above, the injury suffered does not necessarily vary depending on the number of perpetrators.

In sharp contrast to the language it used in the compensatory statutory damages provision, Congress authorized the Court to assess substantial civil penalties "against each respondent" to vindicate the public interest, in an action brought by the Attorney General. *See* 18 U.S.C. § 248(c)(2)(B). Simply

put, Congress knew how to make it clear that each defendant was to be individually and monetarily responsible, when that was its intention. Because it used different language in authorizing compensatory statutory damages, this Court concludes that it meant something different. The considerations referred to above suggest to this Court that Congress meant to authorize $5,000 in compensatory statutory damages against all responsible persons jointly, for each violation.

The fact that, under the circumstances of this case, individual defendants would not necessarily be subject to a meaningful financial deterrent does not change the Court's view. Actual damages are available if proven, and meaningful financial deterrents are provided for under the civil penalty provisions if they would vindicate the public interest.

■ Defendants also argue that in no event may the Attorney General recover the statutory damages referred to in § 248(c)(1)(B). The Court rejects this argument. In an action by the Attorney General under § 248(c)(2), the relief available is the same as that available to an "aggrieved person" plaintiff, except that the Attorney General may not be awarded costs and fees and may recover civil penalties instead of the punitive damages available to the "aggrieved person" plaintiff. The specific cross-reference in § 248(c)(2)(B) to "compensatory damages to persons aggrieved as described in paragraph 1(B)" can only mean that the Attorney General is entitled to the same compensatory (including statutory) damages as an "aggrieved person" plaintiff could recover.

■ Defendants argue that they are entitled to mitigation of damages because their focus on the days in question was on partial birth abortions, which have been declared unlawful by the New Jersey Legislature. The Court rejects this position. Consistent with its prior rulings that partial birth abortions constitute "reproductive health services" within the meaning of FACE, the Court sees no reason to treat a focus on partial birth abortions as a mitigating factor in imposing the statutory damages sought.

■ Finally, defendants argue that the Attorney General is violating 18 U.S.C. § 248(d) and attempting to subvert New Jersey law by bringing this action. The Court disagrees. This action does not constitute interference with the enforcement of P.L. 1997, Chapter 262, whose enforcement mechanisms include license revocations and monetary penalties. *See N.J.S.A.* 2A:65A–5 *et seq.* This action seeks to enforce FACE against conduct which this Court has found to violate its terms.

Based on this interpretation of the statutory damages provision of FACE, the Court finds defendants jointly and severally liable (*see, e.g., Milwaukee Women's Medical Servs.,* 2 F.Supp.2d at 1179) for $5,000 in statutory damages for each violation in which they participated. It appears that only five of the named defendants were involved in the August 7, 1996 violation—Gregg, McDaniel, Menchaca, Pagnanelli, and Raiser. Thus, these defendants will be jointly and severally liable for $5,000. It appears that twelve of the named defendants participated in the January 18, 1997 violation—Menchaca, Henry, Kidd, Matheson, O'Keefe, Alvarado, O'Hara, Roach, Rudnick, Soderna, Sweatt, and Wagi. Thus, these defendants will be jointly and severally liable for $5,000. It appears that nineteen of the named defendants participated in the March 15, 1997 violation—Menchaca, Henry, Kidd, Matheson, O'Keefe, Adams, Blake, Boissonneault, Dino, Elliot, Fitzpatrick, Foley, Green, Lynch, Micco, Mulrenan, Traphagen, James Trott, and Kimiko Trott. Thus, these defendants will be jointly and severally liable for $5,000.

Accordingly, **IT IS** on this 11th day of December 1998 **ORDERED** that the motion for summary judgment of the United States is granted. Final Judgment is entered as follows:

(1) Defendants and their agents, servants, employees, attorneys, and all individuals acting in concert with them who receive actual notice of this Order are prohibited from:

(a) In any physical way, blocking, impeding, inhibiting, interfering with, or obstructing access to the Metropolitan Medical Associates Building and facilities at 40 Engle Street in Englewood, New Jersey (or attempting to do so); and

(b) In any physical way, intimidating or attempting to intimidate anyone seeking ac-

cess to the said Metropolitan Medical Associates building and facilities at 40 Engle Street in Englewood, New Jersey; and

(c) Entering on or being located on or within the premises of said Metropolitan Medical Associates at 40 Engle Street in Englewood, New Jersey (or attempting to do so), unless seeking reproductive health services available from Metropolitan Medical Associates.

(2) Defendants are jointly and severally liable for $5,000 for each violation in which they participated, with a maximum liability of all defendants of $15,000. More specifically, defendants Gregg, McDaniel, Menchaca, Pagnanelli, and Raiser are jointly and severally liable for $5,000 for their violations of FACE on August 7, 1996; defendants Menchaca, Henry, Kidd, Matheson, O'Keefe, Alvarado, O'Hara, Roach, Rudnick, Soderna, Sweatt, and Wagi are jointly and severally liable for $5,000 for their violations of FACE on January 18, 1997; and defendants Menchaca, Henry, Kidd, Matheson, O'Keefe, Adams, Blake, Boissonneault, Dino, Elliot, Fitzpatrick, Foley, Green, Lynch, Micco, Mulrenan, Traphagen, James Trott, and Kimiko Trott are jointly and severally liable for $5,000 for their violations of FACE on March 15, 1997.