UNITED STATES of America,
Plaintiff,

v.

OPERATION RESCUE NATIONAL,
et al., Defendants.

No. C–3–98–113.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 27, 1999.

Dale Ann Goldberg, U.S. Attorney's Office, Dayton, OH, Bill Lann Lee, Steven H. Rosenbaum, Mellie H. Nelson, Pamela K. Chen, Rebecca E. Epstein, Shelley R. Jackson, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for U.S.

Frederick H Nelson, American Liberties Institute, Orlando, FL, for Operation Rescue Nat. Philip Benham, Rusty L. Thomas, James F. Anderson, defendants.

Philip Benham, Garland, TX, pro se.

Rusty L Thomas, Waco, TX, pro se.

Christopher Paul Finney, Finney Bacon & Muehlenkamp Co., Cincinnati, OH, David R Langdon, Cincinnati, OH, for David Mehaffie, defendant.

David R Langdon, Cincinnati, OH, for Heather F. Mechanic, defendant.

Thomas W Condit, Condit & Dressing, Cincinnati, OH, for Olivia A Alaw, defendant.

David Carr Greer, Bieser, Greer & Landis—3, Dayton, OH, Alphonse Adam Gerhardstein, Laufman & Gerhardstein, Cincinnati, OH, for Women's Medical Center of Cincinnati, Women's Medical Center of Kettering, Dayton Women's Services, Julie Goodchild, Charles Weaver, Victoria Tepe, Deborah Crouch, Kristie Kissell, Antonio Green, Martin Haskell, movants.

David M Kreeger, Wilmer, Cutler & Pickering, Washington, DC, for National Abortion Federation, movant.

Ann Wightman, Faruki Gilliam & Ireland—3, Dayton, OH, for Patricia K Chapman, movant.

DECISION AND ENTRY OVERRULING MOTION FOR RECONSIDERATION OF DEFENDANTS PHILIP BENHAM, RUSTY THOMAS AND JAMES ANDERSON (DOC. # 106); DECISION AND ENTRY OVERRULING IN PART AND OVERRULING, AS MOOT IN PART, MOTION FOR SUMMARY JUDGMENT OF DEFENDANT OLIVIA ALAW (DOC. # 127); DECISION AND ENTRY OVERRULING MOTION FOR ADMISSIONS OF DEFENDANT OLIVIA ALAW (DOC. # 128); DECISION AND ENTRY OVERRULING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 130); DECISION AND ENTRY SUSTAINING GOVERNMENT'S MOTION FOR LEAVE TO AMEND (DOC. # 135)

RICE, Chief Judge.

The Government brings this litigation under the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, seeking injunctive relief, statutory damages and the imposition of civil penalties against the Defendants. The genesis of this lawsuit is the Return to Truth Campaign, conducted in Southwest Ohio during mid-July, 1997. During that campaign, the Defendants and numerous other individuals conducted protests at the Women's Medical Center of Cincinnati, Ohio ("Cincinnati Clinic"), on July 14, 1997; at the

Women's Medical Center of Kettering, Ohio ("Kettering Clinic"), on July 15, 1997; and at the Dayton Women's Services in Dayton, Ohio ("Dayton Clinic"), on July 16 and 18, 1997. The Government contends that Defendants Operation Rescue National ("ORN"), Philip Benham ("Benham"), Rusty Thomas ("Thomas"), David Mehaffie ("Mehaffie") and James Anderson ("Anderson") violated FACE by obstructing the relevant clinic on each of those four days. In addition, the Government asserts that Defendants Olivia Alaw ("Alaw") and Heather Mechanic ("Mechanic") violated that statute with respect to the protests at the Cincinnati and Kettering Clinics.

This case is now before the Court on interrelated Motions for Summary Judgment filed by Alaw (Doc. # 127) and the Government (Doc. # 130). In addition to those motions, the Court will rule upon two other motions herein, to wit: the Motion of Benham, Thomas and Anderson for Reconsideration (Doc. # 106) and Alaw's Motion for Admissions (Doc. # 128). As a means of analysis, the Court will initially rule upon the summary judgment motions, beginning by setting forth the standards which are applicable to all such motions. The Court will then address the other two motions in the above order.

I. *Alaw's Motion for Summary Judgment (Doc. # 127) and the Government's Motion for Summary Judgment (Doc. # 130)*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evi-

dence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] dis-trict court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

The Government seeks summary judgment, as to liability, on its claim that Defendants ORN, Benham, Thomas, Mehaffie and Anderson violated FACE on all four days in question and that Alaw and Mechanic violated that statute with respect to the protests at the Cincinnati and Kettering Clinics. In addition to seeking summary judgment as to liability, the Government also requests same as to the relief it has requested in this litigation. Alaw seeks summary judgment on the Government's claim against her.[1] As well as ar-

---

1. Initially, the Government alleged that Alaw and Mechanic had been involved in the protests on July 16th and 18th at the Dayton Clinic. Alaw has moved for summary judgment on the events arising out of the two days of protest that occurred at the Dayton Clinic. However, the Government has concluded that Alaw and Mechanic were not involved in the incidents that occurred at that Clinic (they had been arrested on July 15th at the Kettering Clinic, remained in jail on the 16th and did not participate in the events of the 18th). As a result of that conclusion, the Government has filed a motion seeking leave to amend. *See* Doc. # 135. According to the Government, its proposed amended pleading would merely amend ¶ 32 of its initial pleading to state expressly that Alaw and Mechanic were not involved in the incidents which occurred on July 16th and 18th at the Dayton Clinic. The Government states that counsel for those two Defendants have not opposed that motion (indeed, the Government has captioned its motion as being unopposed). Since the proposed amended pleading can only be beneficial to those Defendants and, further, given that they have not opposed same, the

guing that they did not violate FACE, the Defendants, including Alaw, challenge the constitutionality of that statute. As a means of analysis, the Court will initially consider issues of the Defendants' liability (i.e., the parties' arguments as to whether the evidence raises a genuine issue of material fact, concerning the Defendants' alleged violations of the statute, and their arguments relating to the constitutionality of FACE). If the Court concludes that the Government is entitled to summary judgment as to liability, it will turn to the request for summary judgment on the requested remedies.

### A. Does the Evidence Raise a Genuine Issue of Material Fact Regarding the Alleged Violations of FACE by the Defendants

■ The Government's claim against the Defendants is predicated upon § 248(a)(1), which provides, in pertinent part:

(a) Prohibited activities.—Whoever—

(1) by ... physical obstruction, intentionally ... interferes with or attempts to ... interfere with any person because that person is or has been ... obtaining or providing reproductive health services ·

\* \* \* \* \* \*

shall be subject to ... the civil remedies provided in subsection (c)....[2]

The language of that statute, thus, requires that the Government prove the following elements, in order to establish that a particular defendant has violated the statute, to wit:

1) physical obstruction by the defendant,

2) that the defendant intentionally interfered or attempted to interfere with any person, and

3) because that person is or has been obtaining or providing reproductive health services.

A number of those elements are defined further by the statute and its legislative history. "Physical obstruction" is defined as "rendering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). See also, S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 23 (stating that "physical obstruction" would include blockades intended to interfere with obtaining or providing abortion-related services).[3] "Interfere with" means "to restrict a person's freedom of movement." Id. at 248(e)(2). Although the statute does not define "intentionally," the legislative history makes clear that " 'intent' means 'intending to perform the act and aware of the natural and probable consequence of it.' S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 24 n. 39." United States v. Gregg, 32 F.Supp.2d 151, 157 (D.N.J.1998). See also, United States v. Weslin, 156 F.3d 292, 298 (2nd Cir.1998) (rejecting defendants' mens rea defense that they intended to save the lives of babies, rather than to violate FACE, since that statute merely requires that the defendant intend to in-

---

Court sustains the Government's Motion for Leave to Amend (Doc. # 135). As a consequence, the Court will treat that aspect of Alaw's Motion for Summary Judgment (Doc. # 127), concerning the events at the Dayton Clinic on July 16th and 18th, as being moot.

**2.** Section 248(a)(1) also proscribes acting by force or threat of force, and intentionally injuring or intimidating, or attempting to injure or to intimidate a person because she is or has been obtaining or providing reproductive health services. These provisions of § 248(a)(1) are not implicated in this litiga-

tion. In addition, § 248(a)(2) and (3) prohibit, respectively, interference with a person's attempt to exercise his right to religious freedom and damaging or destroying a facility that provides reproductive health services or a place of worship. The Government does not rely upon § 248(a)(2) or (3) in this litigation.

**3.** The Plaintiff has provided a copy of S.Rep. 103–117 as Exhibit 5 to its Motion for Summary Judgment.

terfere with the obtaining and provision of reproductive services), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999). The term "reproductive health services" is defined as:

> reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling (sic) or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.

18 U.S.C. § 248(e)(5). Finally, the legislative history and courts have noted that the phrase "because that person is or has been ... obtaining or providing reproductive health services," requires that the Government prove that the defendant's actions were motivated by the fact that a person is or has been obtaining or providing such services. *See* S.Rep. No. 103–117, *supra,* at 29–30 (discussing constitutionality of "motive element"); *United States v. Wilson,* 2 F.Supp.2d 1170, 1171–72 (E.D.Wis.), *affirmed,* 154 F.3d 658 (7th Cir.1998), *cert. denied,* 525 U.S. 1081, 119 S.Ct. 824, 142 L.Ed.2d 681 (1999).

With the foregoing discussion of the relevant statute in mind, the Court turns to the 24 violations of the statute at issue in this litigation (i.e., four violations each by ORN, Benham, Thomas, Mehaffie and Anderson, and two violations each by Alaw and Mechanic). As a means of analysis, the Court will initially describe the physical layout of the three clinics, following which it will set forth certain matters which are not controverted. Finally, the Court will discuss the matters that the parties argue are controverted.[4]

The Cincinnati Clinic is located at 3219 Jefferson Avenue, within the city of Cincinnati. That clinic is bounded in front and on one side by its parking lot, which has one exit/entrance, emptying onto Jefferson Avenue. The Cincinnati Clinic has three doors, one in front (which is used only by staff), one on the side (which is used by patients and staff) and a door on the second floor, which serves as a fire escape (the door on the second floor is connected to the parking lot by a metal staircase).[5] The Kettering Clinic is located at 1401 East Stoop Road in Kettering. That clinic has four entrances, three in the front and one in the rear. The Dayton Clinic is located at 1829 North Main Street in Dayton. That clinic has two main entrances, a front and a rear door. The front door opens onto a short flight of concrete steps, which lead to a walkway and, then, to a second flight of steps. That second flight of steps leads to a public sidewalk that runs parallel to North Main Street.[6] The back door can be accessed through a parking lot, which opens onto an alley that runs parallel to North Main Street.

The Defendants do not dispute that the three clinics provided reproductive health services, in July 1997. In addition, it cannot be doubted that the Defendants engaged in the activities giving rise to this litigation, because the three clinics provided such services. The Government has presented evidence to support that element, including a flier announcing the Return to Truth campaign, which discusses the importance of conducting protests in the Dayton area because it is the home of Dr. Martin Haskell, who is described the inventor of the partial birth abortion proce-

---

4. The discussion of events at the three clinics on the four days in question is taken from the following sources of evidence, to wit: video tapes of the four days of protests and the depositions, affidavits and declarations of the Defendants and workers at the three clinics. The Court has construed that evidence in the manner most favorable to the Defendants, when ruling upon the Government's Motion

for Summary Judgment (Doc. # 130), and in the manner most favorable to the Government, when ruling upon that filed by Alaw.

5. That clinic also has a garage door.

6. The second flight of steps is surrounded on either side by large rocks.

dure.[7] In addition, the depositions, affidavits and declarations of the Defendants are replete with statements to the effect that they participated in the events of mid-July, because of their desire to save the lives of unborn children and to protest abortion.

With the exception of those uncontroverted matters, the Court concludes that the evidence raises genuine issues of material fact concerning the other elements of the Government's claim under § 248(a)(1), to wit: did the Defendants physically obstruct the three clinics on the four days in question and did they intentionally interfere or attempt to interfere with those seeking to enter or to leave one or more or all of the clinics on the days in question. Although the Government argues that the evidence establishes, as a matter of law (rather than raising a genuine issue of material fact), that the Defendants engaged in "physical obstruction" as that term is defined by FACE, construing the evidence in the manner most favorable to the Defendants, this Court cannot agree.

True, the video tapes of the four days of protest,[8] as well as the declarations and deposition testimony by members of the staff of the three clinics do establish that protestors stood or sat in areas which could have physically obstructed access to those clinics by making that access more difficult. With respect to the Cincinnati Clinic, beginning at approximately 8:00 a.m., on July 14, 1997, and lasting for approximately one hour, those involved in the Return to Truth campaign blockaded both the front and rear doors at that location. A number of protestors (approximately 15) sat on the steps leading to the front door. In addition, another phalanx of protestors (from 15–25) surrounded the side door, two or three deep. While this activity was occurring, the clinic's director, Julie Goodchild, and Cincinnati Police Captain Phyllis Caskey both addressed the protestors, warning them that they were trespassing and that they would be arrested if they did not leave. The protestors did not leave in response to that warning. Rather, it was not until a few minutes later, when an arrest team from the Cincinnati Police Department arrived on the scene, that the blockade and the trespassing activity came to an end. There is no evidence that, during that protest, the protestors (much less any of the Defendants) actually prevented any person from entering or leaving that clinic by coming into contact with that person. Nevertheless, the evidence is certainly sufficient for a jury to find that access to the Cincinnati Clinic was made, at a minimum, unreasonably difficult. The issue of reasonableness is a quintessential jury question, particularly within the above factual context where genuine issues of material fact abound.

With respect to the Kettering Clinic, on July 15th, rows of protestors blockaded a front door, initially standing and then sitting in front of it.[9] A Kettering police officer issued a collective warning to the protestors, who were sitting in front of that door, informing them that they were trespassing and telling them to leave or face arrest. When none left, he selected two individuals and specifically told them to leave within one minute or be arrested. Those individuals ignored that warning and were arrested. The officer then repeated that process with two others, who similarly ignored the warning and were

---

7. Dr. Haskell owned the Cincinnati and Kettering Clinics. Benham authenticated the flier during his deposition.

8. The Government has supplied a number of tapes that were taken during those four days, which include both edited and unedited versions. Declarations authenticating the video tapes are attached to the Government's Motion for Summary Judgment as Exhibit 7.

None of the Defendants has challenged the authenticity of the video tapes.

9. In addition, protestors also placed themselves in front of the clinic's other doors. The following recitation of events is taken from the authenticated video tape, which focused upon the front door.

then arrested.[10] Thereafter, the officer would warn four at a time, and decreased their compliance time to 30 seconds. Following the initial arrests, the protestors all acceded to the warnings and left the area where they had been blocking the front steps.[11] Ultimately, the area became cleared of protestors. In one incident at the Kettering Clinic, before the protestors left the property, a patient drove to the parking lot and, as she got out of the car, protestors, upon being given a signal, rushed to a door and stood in front of it, as if to prevent the patient from entering. That patient returned to a vehicle, rather than attempting to enter the clinic. However, the Government has not presented sufficient evidence for this Court to conclude, as a matter of law, that she did not enter the clinic because the Defendants physically obstructed her access. For instance, there is evidence that she became upset upon seeing the protestors. It is possible that she decided not to enter the clinic, because she did not want to confront them, even though their presence would not have physically prevented her from entering the clinic or made access to it unreasonably difficult.

With respect to the Dayton Clinic, protests occurred on both July 16th and July 18th. On both days, protestors placed themselves at both ends of the alley, making access to the parking lot certainly more difficult than it would have been if they had not been there (whether access was made unreasonably difficult will be for the jury to decide).[12] In addition, another group placed themselves on the public sidewalk, sitting in front of the stairs leading to the front door. The video tape of the July 16th incident shows a patient climbing over the protestors seated on the public sidewalk in front of the stairs leading to the clinic. Although one can certainly argue that her access was made

unreasonably difficult, it is possible to argue that her access, while difficult, was not unreasonably so. In addition, there were instances, on both July 16th and 18th, in which volunteers, staff members and patients at the clinic were required to weave their way through rows of protestors seated in the alley. The protestors were told not to touch anyone and can be seen leaning away from the individuals. While the jury might find that the access of those individuals was nevertheless made unreasonably difficult, given that they had to weave their way through the seated protestors, the jury could make the opposite finding. Accordingly, genuine issues of material fact exist on this crucial issue.

Thus, the evidence raises a genuine issue of material fact as to whether the clinics were physically obstructed on the four days in question. However, the crux of the parties' arguments focus upon the second element of the Government's claim, whether the Defendants intentionally interfered or attempted to interfere with those seeking to enter or to leave one or more or all of the clinics on the days in question. The Defendants argue that they did not interfere with any such person. Their arguments are most forcefully presented by Alaw, who essentially takes the position that she cannot be held liable, unless the Government proves that she actually interfered with an individual seeking to enter or to leave the particular clinic in question (i.e., that she, herself, physically impeded or attempted to impede a particular individual). There is no evidence that a particular individual was prevented or an attempt was made to prevent a particular individual from entering or leaving one of the clinics (or that her access was made unreasonably difficult) by the individual actions of one or more of the particular Defendants. For instance,

---

10. Alaw and Mechanic were two of those arrested.

11. Initially, when one protestor would leave, another would take his or her place.

12. More than one row of protestors stood shoulder to shoulder, holding large signs in the front row, somewhat reminiscent of a cohort from the Roman Legion.

there is no evidence that Jane Doe attempted to enter the Cincinnati Clinic, on July 14th, only to have to climb over Alaw, with unreasonable difficulty. In addition, construing the evidence in the manner most favorable to the Defendants, none of them was asked to move aside, in order to permit someone to enter or to leave a particular clinic, while in the blockades were in progress. In addition, each of the individual Defendants has presented an affidavit or declaration, stating that he or she participated in the events in question, in order to protest abortion and to express his or her support for unborn children, rather than to interfere or attempt to interfere with any person seeking to enter or to leave one or more or all of the clinics on the days in question. The Defendants also state in their affidavits and declarations that they did not interfere or attempt to interfere with any such person. Nevertheless, the Government argues that the evidence establishes, as a matter of law, that the Defendants did either intentionally interfere with people seeking to enter or to exit the clinics (i.e., restricted their freedom of movement) or that they attempted to do so.

Construing the evidence in the manner most favorable to the Defendants, when ruling upon the Government's motion, and in the manner most favorable to the Government, when ruling upon that filed by Alaw, this Court concludes that the evidence raises a genuine issue of material fact as to whether the one or more or all of the Defendants either intentionally interfered or attempted to interfere with any person seeking to enter or to leave the clinics. With respect to intentional interference, there is evidence that individuals (employees and/or patients) did not enter or leave the three clinics, while the protests were occurring. However, the Court cannot conclude that the precipitating cause of that lack of ingress or egress was the fact that the Defendants restricted their freedom of movement, by interfering or attempting to interfere with any individual seeking to enter or to leave one or more or all of the clinics on the days in question, thus making access unreasonably difficult. For instance, there is evidence that patients and staff members had to climb over protestors in order to enter the Dayton Clinic. However, there is also evidence that the protestors were told to let pass unimpeded those attempting to enter that clinic. In addition, there is evidence that a patient did not attempt to enter the Kettering Clinic, upon seeing the protestors. Whether she so acted because her freedom of movement was restricted or for some other reason will be for the jury to determine.

■■■ With respect to an attempt to interfere with access, the Sixth Circuit has repeatedly said that an attempt is shown by proof that a person intended to engage in the prohibited conduct (in this case, to interfere with access to facilities providing reproductive health services), coupled with a substantial step towards the commission of that activity. *See e.g., United States v. Bilderbeck*, 163 F.3d 971, 974 (6th Cir. 1999); *United States v. Shelton*, 30 F.3d 702, 705 (6th Cir.1994). Given that each of the Defendants has submitted an affidavit or a declaration stating that he or she participated in the events in question in order to protest against abortion and to show support for unborn children, rather than to interfere with access to the clinics, and, further, since each of the Defendants has stated that he or she did not interfere or attempt to interfere with any person seeking to enter or to leave any of the clinics, it is for the jury to decide whether the Defendants acted with the requisite intent. In addition, the Defendants' affidavits and declarations are supported by other evidence. For instances, during July 16th and 18th, protestors at the Dayton Clinic were told by leaders of the demonstration to avoid grabbing or even touching any individual who was attempting to enter or to leave that facility (although those protestors did not leave the

positions they were then occupying).[13]

In sum, the Court concludes that the evidence raises genuine issues of material fact as to whether the Defendants engaged in physical obstruction and, if so, whether they intentionally interfered or attempted to interfere with those seeking to enter or to leave one or more or all of the clinics on the days in question. Consequently, the Court cannot sustain either the Government's Motion for Summary Judgment or that filed by Alaw.

## B. Defendants' Constitutional Challenges to FACE

■ In addition to arguing that they did not violate the statute, the Defendants have raised constitutional challenges, arguing that Congress exceeded its power under the Commerce Clause, when it enacted FACE, and that said statute violates the Tenth Amendment. In addition, Alaw has argued that the statute violates the First Amendment. For reasons which follow, the Court disagrees.[14]

## 1. Commerce Clause

■ The Defendants argue that FACE was not constitutionally enacted in accordance with the Commerce Clause, because it addresses activities that have been traditionally regulated by the states, such as trespassing and the like. In addition, the Defendants argue that the statute is unconstitutional because it does not regulate commercial activity. The Defendants also point out that FACE does not contain a jurisdictional element. In support of their assertion that FACE is unconstitutional, because its enactment exceeded the authority invested in Congress by the Commerce Clause, the Defendants rely upon *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), where-

---

13. This Court rejects the Defendants' argument that the Government must establish that they actually *prevented* a patient or staff member from entering one of the clinics (or personally made access unreasonably difficult by restricting such a person's freedom of movement). FACE prohibits people from engaging in joint action, which, by physical obstruction, intentionally interferes or attempts to interfere with a person's access to a facility providing reproductive health services. The legislative history is replete with statements that one of the primary purposes of FACE was to prohibit the large blockades which made access to such facilities unreasonably difficult, if not impossible. To further that purpose, Congress prohibited *attempts* to interfere with access, as well as actual interference with same. In *United States v. Wilson*, 2 F.Supp.2d 1170 (E.D.Wis.), *affirmed*, 154 F.3d 658 (7th Cir. 1998), *cert. denied*, 525 U.S. 1081, 119 S.Ct. 824, 142 L.Ed.2d 681 (1999), the District Court rejected the argument that the Government need show that the defendant interfered with the access of a particular person, writing:

> One of the defenses to this case is that the government failed to show that any particular person was interfered with by the defendants' obstruction. This need not be proven by the government because clearly the defendants attempted to do so.

*Id.* at 1171 n. 1. Of course, whether the Government will be able to prove that the Defen-

dants attempted to interfere generally with access remains to be seen.

In addition, a number of Defendants have argued that liability cannot be imposed upon them for directing individuals to blockade the entrances to a clinic. This Court does not agree. The statute prohibits, *inter alia*, attempting to interfere with access, by physical obstruction. Just as one can physically obstruct a clinic by placing impassible obstacles in front of it (*Wilson, supra*, finding that the defendant had violated FACE by placing a disabled car in front of a clinic, blocking access to it), one may accomplish that end by directing others to stand, sit or lie in front of entrances to a clinic.

14. The legislative history indicates that Congress enacted FACE pursuant to both the Commerce Clause and § 5 of the Fourteenth Amendment. The Defendants also argue that the statute was not validly enacted under that Amendment. The Commerce Clause and § 5 of the Fourteenth Amendment are independent sources of authority, which permit Congress to enact legislation. Consequently, if Congress validly enacted FACE, in accordance with the authority granted by one of those constitutional provisions, it is immaterial whether it so acted with respect to the other. For reasons set forth in the text of this Decision, the Court concludes that the statute was constitutionally enacted under the Commerce Clause; therefore, it does not address § 5 of the Fourteenth Amendment.

in the Supreme Court concluded that the Gun Free School Zones Act was not enacted consistently with the authority granted by the Commerce Clause. Therein, the Supreme Court premised its conclusion, in part, on the omission of a jurisdictional element from that statute. Nevertheless, despite a similar omission from FACE, every Circuit considering the question, both before and after *Lopez*, has rejected a constitutional challenge to FACE, based upon the Commerce Clause. In *Weslin*, *supra*, the Second Circuit recently wrote:

> Several of our sister circuits have considered constitutional challenges to FACE, and all of them have found the statute to be constitutional. *See United States v. Wilson*, 154 F.3d 658 (7th Cir. 1998); *United States v. Bird*, 124 F.3d 667 (5th Cir.1997), *cert. denied*, 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998); *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir.1997), *cert. denied*, 523 U.S. 1136, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); *Terry v. Reno*, 101 F.3d 1412 (D.C.Cir.1996), *cert. denied*, 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); *United States v. Soderna*, 82 F.3d 1370 (7th Cir.1996), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.1996), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995). We agree, and we have little to add to their analyses.

FACE is a valid exercise of Congress's power under the Commerce Clause. Under *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Congress can use its commerce power to regulate three categories of activity. Congress may regulate (1) the channels of interstate commerce; (2) the "instrumentalities" of interstate commerce, or persons or things in interstate commerce; (3) activities having a "substantial relation" to, or which "substantially affect," interstate commerce. *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624. FACE is valid under (3).

When Congress enacts a statute on the theory that the activity regulated substantially affects interstate commerce, the scope of judicial review is limited to the question of whether Congress had a rational basis for reaching that conclusion. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 276–80, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Lopez*, the Supreme Court noted the absence of specific congressional findings that the Gun Free School Zones Act regulated activities substantially affecting interstate commerce. *Lopez*, 514 U.S. at 562, 115 S.Ct. 1624. In contrast, Congress specifically found that the activities governed by FACE affect interstate commerce. The legislative history of FACE shows that Congress specifically found that "women travel interstate to obtain reproductive health services." H.R.Rep. No. 103–306 at 6 (1993), U.S.Code Cong. & Admin.News at 699, 703. See also *id.* at 8 (describing a woman who had to travel from Virginia to Kansas to obtain the particular procedure she required). Similarly, and in part because of a shortage of doctors willing to perform abortions, doctors travel from state to state and often cover great distances to perform abortions. See S.Rep. No. 103–117 at 31 & n. 46 (1993) (quoted in *Terry*, 101 F.3d at 1416). Congress also found that clinics purchase medical and other supplies in interstate commerce. S.Rep. No. 103–117 at 31 (quoted in *Terry*, 101 F.3d at 1415–16).

Congress may regulate to prevent the inhibition or diminution of interstate commerce. *See Katzenbach v. McClung*, 379 U.S. 294, 299–300, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). This is so even when the activity controlled is not itself commercial. Thus, the Supreme Court has held (in another case involving harassment at abortion clinics) that threats of violence that have the

effect of deterring commercial activity are within the ambit of RICO, even though the threats are made for noncommercial purposes. *See National Org. for Women v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). RICO, like FACE, is a statute enacted under the Commerce Clause.

Because FACE could be validly enacted under the Commerce Clause, it does not matter whether Congress's motive in enacting the statute was commercial, noncommercial, or mixed. For Congress may regulate interstate commerce for any purpose not affirmatively forbidden by the Constitution. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256–57, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (describing variety of noncommercial purposes for which Congress may regulate interstate commerce); *United States v. Von Foelkel*, 136 F.3d 339, 341 (2d Cir.1998) (per curiam) (upholding a provision of the Violence Against Women Act, 18 U.S.C. 2262(a)(1), against a Commerce Clause challenge that was based on the noncommercial nature of the provision). 156 F.3d at 295–96. This Court finds the analysis of the Second Circuit (as well as that contained in the cases cited therein) to be persuasive. As did the Second Circuit, this Court concludes that Congress had a rational basis for finding that the types of activities regulated by FACE substantially affect interstate commerce. Congress specifically found that both women and physicians travel in interstate commerce, in order to obtain or to provide abortions, and that clinics providing those services purchase medical and other supplies in interstate commerce. In addition, in rejecting post-*Lopez*, constitutional challenges to other statutes, the Sixth Circuit has repeatedly rejected the argument that a jurisdictional element is a *sine qua non* of valid enactment under the Commerce Clause. *See e.g., United States v. Abdullah*, 162 F.3d 897 (6th Cir.1998) (rejecting Commerce Clause challenge to 18 U.S.C. §§ 2341–46, which prohibits trafficking in

contraband cigarettes, despite the absence of a jurisdictional requirement from that statute, because the legislative history recognized the pervasive effects of cigarette smuggling on interstate commerce); *United States v. Wall*, 92 F.3d 1444 (6th Cir. 1996) (rejecting Commerce Clause challenge to 18 U.S.C. § 1955, which prohibits operating an illegal gambling business, despite the absence of a jurisdictional requirement from that statute), *cert. denied*, 519 U.S. 1059, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997). Accordingly, the Court concludes that Congress did not violate the Commerce Clause when it enacted FACE.

### 2. Tenth Amendment

In *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995), the Eleventh Circuit rejected the argument that the Congress had violated the Tenth Amendment by enacting FACE, writing:

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Therefore, Congress' valid exercise of authority delegated to it under the Constitution does not violate the Tenth Amendment. *United States v. Lopez*, 459 F.2d 949, 951 (5th Cir.), *cert. denied*, 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).

*Id.* at 1519. *See also, United States v. Bird*, 124 F.3d 667, 676 n. 10 (5th Cir.1997) (noting, in the context of a Commerce Clause challenge to FACE, that the Tenth Amendment does not limit the power of Congress under that Clause), *cert. denied*, 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998). *Cf. United States v. Dumas*, 934 F.2d 1387, 1390 (6th Cir.1990) (concluding that Congress validly enacted 18 U.S.C. § 924(c) under the Commerce Clause and that, therefore, that statute does not violate the Tenth Amendment), *cert. denied*, 502 U.S. 1006, 112 S.Ct. 641, 116 L.Ed.2d 658 (1991). As the Eleventh Circuit noted in *Cheffer* and the Sixth Cir-

cuit in *Dumas,* Congress does not violate the Tenth Amendment, when it validly enacts legislation in accordance with the authority invested in it by the Constitution. Since the Court has concluded that FACE was validly enacted pursuant to the authority invested in Congress by the Commerce Clause, this Court also holds that said statute does not violate the Tenth Amendment.[15]

### 3. First Amendment

■ Alaw has argued that she is entitled to summary judgment, because she was engaged in expressive conduct on July 14th at the Cincinnati Clinic and on July 15th at the Kettering Clinic and that, therefore, the First Amendment prevents her from being held liable for violating the statute.[16] Accepting for present purposes that Alaw's conduct had an expressive component, that does not mean that prohibiting it violates the First Amendment. Courts have repeatedly rejected First Amendment challenges to FACE. For instance, in *Weslin, supra,* the Second Circuit concluded that FACE does not violate the First Amendment, because that statute regulates conduct rather than speech, even though the regulated conduct has an expressive component. The *Weslin* court wrote:

> The defendants argue that the state may not restrict conduct based on the mes-

sage the conduct expresses, and they urge an analysis based on *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (striking down a "Bias–Motivated Crime Ordinance"). This line of reasoning is not in point. The law in *R.A.V.* dealt with pure speech and discriminated on the basis of viewpoint as well. FACE, which in any case is viewpoint-neutral, does not govern speech as such but, instead, is concerned with conduct that frequently has expressive components.

The distinction between regulating speech and regulating conduct that has expressive components is fundamental. It is why government can validly prohibit a range of activities ranging from secondary boycotts, *see International Longshoremen's Ass'n. v. Allied Int'l,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), through public nudity, *see Barnes v. Glen Theatre,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), to political assassinations, *see* Tribe, *American Constitutional Law* 828 n. 18 (2d ed.1988) (cited in [*United States v. Soderna,* 82 F.3d 1370, 1374–75 (7th Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996) ]). It would be wrong to say that those activities are not or cannot be forms of expression. But the fact that they have

---

**15.** It should be noted that the Supreme Court has recently breathed fresh life into the Tenth Amendment and other federalism jurisprudence. For instance, in *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Supreme Court concluded that a provision in the Low–Level Radioactive Waste Policy Amendments Act of 1985 violated the Tenth Amendment, because that provision "commandeered" the state's legislative process by requiring that each state either regulate low-level radioactive waste generated or take title to that waste. FACE in no manner commands the states to take any action. Therefore, cases such as *New York* are inapposite.

**16.** In support of that argument, Alaw cites *State v. Barksdale,* 2 Ohio St.3d 126, 443 N.E.2d 501 (1983), wherein the Ohio Supreme Court held that the defendant had not

committed the offense of breaking and entering, by entering a used car lot, since his entry was pursuant to an implied business invitation and, therefore, did not constitute a trespass (breaking and entering prohibited trespassing on the land of another with the intent to commit a felony). Herein, Alaw plead guilty to trespassing as a result of the events at the Kettering Clinic. In addition, she and the other protestors refused to leave the Cincinnati Clinic, despite being told to do so, until the arrest team arrived. However, even if she did not commit the criminal offense of trespassing, as defined by the law of Ohio, at either the Cincinnati or the Kettering Clinic, that would not mean that the First Amendment gave her the right to enter the land of another in order to participate in a blockade of that facility prohibited by FACE.

expressive aspects does not exempt them from governmental prohibition.

The constitutionality of laws that burden expression while restricting proscribable conduct is determined by the criteria laid down in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *O'Brien* establishes a three-prong test: (i) the regulation must serve an important or substantial governmental interest; (ii) the interest must be unrelated to the suppression of expression; (iii) the incidental restriction of First Amendment freedoms must be narrowly tailored to that interest. *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. We consider the three prongs in turn.

First, the Supreme Court has held that the government's interests in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services" are, in combination, sufficient to support an injunction against pro-life protestors. *Schenck v. Pro–Choice Network*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). Given that the standard for injunctions is stricter than the standard for statutes, *see Madsen [v. Women's Health Center, Inc.*, 512 U.S. 753, 764–65, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ], the same interests are sufficient to support FACE. Second, those interests are unrelated to the suppression of free expression. They are compatible with non-obstructive, non-destructive demonstrations near reproductive health clinics. And the legitimate governmental objectives of FACE will clearly be satisfied regardless of whether such unprohibited demonstrations occur and convey messages of opposition to abortion. Third, FACE is narrowly tailored. It leaves anti-abortion protestors and all other persons wishing to exercise free speech rights under the First Amendment at liberty to hold signs, pass out handbills, speak conversationally, and so forth, anywhere and anytime they choose. FACE is therefore valid under *O'Brien.*

156 F.3d at 297–98. *See also, United States v. Wilson*, 154 F.3d 658 (7th Cir. 1998) (noting that the conduct prohibited by FACE is not protected by the First Amendment). This Court finds the results reached and the rationale employed in those and other cases which have rejected First Amendment challenges to FACE to be persuasive. Accordingly, the Court rejects Alaw's assertion that liability cannot be imposed upon her, because FACE violates the First Amendment.

Accordingly, while the Court has rejected the Defendants' constitutional challenges to FACE, it overrules the Government's Motion for Summary Judgment (Doc. # 130), and that filed by Alaw (Doc. # 127).

## C. Remedies Requested by the Government

The Government also requests summary judgment on the remedies it has sought, to wit: permanent injunctive relief, statutory damages and civil penalties. The remedies available in a civil action under FACE are contained in § 248(c), which provides in pertinent part:

c) *Civil remedies.—*

(1) *Right of action.—*

(A) *In general.—*Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a facility that provides reproductive health services....

(B) *Relief.—*In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and

reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

(2) *Action by Attorney General of the United States.—*

(A) *In general.*—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court.

(B) *Relief.*—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

(i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and

(ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000 for any other subsequent violation.

Given that the Court has concluded that genuine issues of material fact preclude the grant of summary judgment in favor of the Government, as to liability, it is apparent that the Government is not entitled to summary judgment on any of the remedies it seeks. However, the Court will discuss two of those remedies (statutory damages and civil penalties), in order to resolve certain legal issues.[17]

---

**17.** The Government is not seeking to recover actual damages that anyone may have suf-

## 1. *Statutory Damages*

▮▮▮ Section 248(c)(1)(B) provides "[w]ith respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." That statutory language leads to two conclusions. *First*, statutory damages are a subset of compensatory damages, with actual damages being the other subset. *Second*, a private plaintiff has an absolute right to elect to recover statutory damages in the sum of "$5,000 per violation." In other words, a private, aggrieved plaintiff, who has established that the defendant violated the statute, has an absolute statutory right to recover the sum of $5,000.00, without need for the jury to determine whether that person has suffered damages. Of course, this action was initiated by the United States, rather than by a private plaintiff. The Government is, however, authorized to recover "compensatory damages to persons aggrieved as described in paragraph (1)(B)." 18 U.S.C. § 248(c)(2)(B). While that statutory provision, subsection (c)(2)(B), does not expressly refer to statutory damages, the only reasonable construction of same is that the Government may recover statutory damages. The phrase "as described in paragraph (1)(B)," as contained in § 248(c)(2)(B), can only modify "compensatory damages," since that paragraph describes "compensatory damages" rather than "persons aggrieved." Under § 248(c)(1)(B), statutory damages are a subset of compensatory damages, rather than being a distinct type of damages. Therefore, by authorizing the Government to recover compensatory damages, Congress has also permitted it to recover statutory damages, a component of compensatory damages, on behalf of any "aggrieved person."

fered, as a result of the four days of protest.

■ The parties disagree about the amount of statutory damages that can be awarded, with the Government arguing that the Court should assess those damages on a per-Defendant/per-violation basis, so that those Defendants who are found to have participated in all four days of the protests would be liable for $20,000 apiece while Alaw and Mechanic could each be liable for $10,000 (since it is alleged that they were involved only in the protests at the Cincinnati and Kettering Clinics).[18] The Defendants, on the other hand, contend that the Court can only award a total of $20,000 in statutory damages, $5,000 for each of the four days of protest. In other words, the Government contends that $5,000 in statutory damages can imposed upon each Defendant involved for each incident in which that Defendant was involved (i.e., on a per Defendant basis), while the Defendants contend that the Court can award only $5,000 total against all Defendants, jointly and severally, for each incident (i.e., on a per incident basis). The courts considering the question have unanimously concluded that statutory damages can be awarded only on a per incident basis. *See United States v. Gregg*, 32 F.Supp.2d 151 (D.N.J.1998); *Milwaukee Women's Medical Servs. v. Brock*, 2 F.Supp.2d 1172 (E.D.Wis.1998); *Planned Parenthood of Southeastern Pa. v. Walton*, 1998 WL 88373 (E.D.Pa.1998). In *Gregg*, the District Court explained its rationale:

> The first dispute is whether the "$5,000 per violation" clause in § 18 U.S.C. 248(c)(1)(B) authorizes imposition of $5,000 in statutory damages per defendant participating in a given blockade-type violation of FACE, or whether that section authorizes only $5,000 per blockade, presumably to be shared by all

defendants participating in such blockade. Two district court cases have addressed this precise question, and both of them resolved the issue in accordance with the contention of defendants here. *See Greenhut*, 996 F.Supp. at 379 (awarding $5,000 per violation); *Milwaukee Women's Medical Servs.*, 2 F.Supp.2d at 1178 (stating that FACE authorizes statutory damages in the amount of $5,000 per violation, not per defendant).

This Court also resolves the issue in accordance with the contentions of the defendants here, for the following reasons. The Court's starting point on any question of statutory interpretation is the language of the statute. Built into that language is a dichotomy of expression that this Court finds meaningful as to the intent of Congress. In authorizing compensatory "statutory damages," Congress used the phrase "per violation." The intent of Congress was to eliminate the usual burden of an aggrieved person to prove actual damages, and to authorize compensation to such person, in an amount which it felt to be fair and just, for interference with that person's right to obtain or provide reproductive health services. Such fair and just compensation does not depend on, or relate to, the number of defendants interfering with such a right. One person can just as effectively injure, interfere with, or intimidate as can a group, depending on the circumstances. Moreover, conduct not involved here, but subject to the same civil remedies, such as interference with religious freedom rights and damage to religious worship facilities, can be perpetrated by a single individual or by a group. Given those variables, in this Court's view,

---

**18.** The Government has not identified the "aggrieved person" on behalf of whom it seeks to recover statutory damages (as a subset of compensatory damages). The only reasonable construction of § 248(c)(2)(B) is that the right of the Government to recover such damages does not mean that such will be paid to the Treasury; rather, the Government can recover such sums on behalf of an "aggrieved person." Therefore, the Government will not be entitled to recover any sum of statutory damages until it identifies the "aggrieved person" on whose behalf it seeks to obtain same.

Congress chose to authorize compensatory statutory damages in a fixed amount regardless of the number of individuals participating in the violation. Moreover, being compensatory, the $5,000 award logically and legally relates to the injury suffered rather than to the number of perpetrators, and, as indicated above, the injury suffered does not necessarily vary depending on the number of perpetrators.

In sharp contrast to the language it used in the compensatory statutory damages provision, Congress authorized the Court to assess substantial civil penalties "against each respondent" to vindicate the public interest, in an action brought by the Attorney General. *See* 18 U.S.C. § 248(c)(2)(B). Simply put, Congress knew how to make it clear that each defendant was to be individually and monetarily responsible, when that was its intention. Because it used different language in authorizing compensatory statutory damages, this Court concludes that it meant something different. The considerations referred to above suggest to this Court that Congress meant to authorize $5,000 in compensatory statutory damages against all responsible persons jointly, for each violation.

32 F.Supp.2d at 160–61. The Court finds the rationale articulated by the District Court in *Gregg* to be persuasive. Nevertheless, the Government argues that cases such as *Gregg* were wrongly decided, because those decisions fail to take into account the deterrent purpose of statutory damages.[19] In particular, the Government relies upon the Senate Report, discussed above, wherein it is indicated that the authorization of statutory damages is appropriate to encourage victims to pursue violations and as a deterrent to violators. S.Rep. No. 103–117 at 27. While the Government correctly cites a portion of the legislative history, other such history is

seemingly in conflict. For example, the Judiciary Committee of the House of Representatives indicated that the statute permitted an aggrieved person to elect to receive statutory damages because of the difficulty and expense of proving actual damages. *See* H.Rep. No. 103–306 at 13, *reprinted in,* 1994 U.S.C.C.A.N. 699, 710. Given the seemingly conflicting legislative history, this Court cannot conclude that statutory damages can be awarded on a per incident/per defendant basis, merely because the Senate indicated that the availability of statutory penalties would serve a deterrent purpose. Accordingly, the Court concludes that all Defendants involved in a particular incident are jointly and severally liable for $5,000 in statutory damages for that incident, rather than each Defendant being individually liable for that sum for each incident in which he or she participated.

### 2. Civil Penalties

■ Section 248(c)(2)(B) authorizes "the court" to impose a civil penalty, not exceeding $10,000 for a nonviolent physical obstruction, in order to vindicate the public interest. Such penalties may be assessed against "each respondent." Since the Court has concluded that the Government has failed to establish, as a matter of law, that the Defendants violated FACE, it would be inappropriate to address the amount of civil penalties to impose upon each Defendant. However, it is proper to address the issue of who should determine the appropriate civil penalty to impose, the Court or the jury. In *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Supreme Court addressed an analogous issue. Therein, the Government had alleged that the defendant had violated the Clean Water Act, 33 U.S.C. § 1251, *et seq.,* by dumping fill in wetlands. The Government requested that the District Court impose civil penalties upon the defendant, in accordance with 33 U.S.C. § 1319(d). The defendant

---

**19.** The Government states that it has appealed the District Court's conclusion in *Gregg* that

statutory damages should be awarded on a per incident basis.

demanded a jury trial, in which the jury would decide both whether he had violated the Act and, if so, the appropriate amount of the penalties to impose. The District Court denied the request for a jury trial and, after a bench trial, imposed a significant penalty upon the defendant. The Fourth Circuit affirmed. Upon further appeal, the Supreme Court concluded that the Seventh Amendment guaranteed the defendant a right to have a jury determine whether he had violated the Clean Water Act, but that said constitutional provision did not give the defendant the right to have a jury assess the amount of the penalty.

Therefore, the Court is of the opinion that it, rather than the jury, will determine the amount of civil penalties to assess against any one or more or all of the Defendants who are found to have violated FACE.

In sum, the Court has overruled both the Government's Motion for Summary Judgment (Doc. # 130), and that filed by Alaw (Doc. # 127).

II. *Motion of Benham, Thomas and Anderson for Reconsideration (Doc. # 106)*

■ With their Motion for Reconsideration (Doc. # 106), Benham, Thomas and Anderson request that the Court reconsider its Decision of March 10, 1999 (Doc. # 97), wherein the Court overruled their Motion to Dismiss for Lack of Personal Jurisdiction. Based upon the reasoning and citations of authority set forth in its Decision of March 10, 1999, as well as upon the following, the Court overrules the Motion for Reconsideration (Doc. # 106). In order to determine whether personal jurisdiction exists over a nonresident defendant, a District Court must apply the law of the state in which it sits, subject to the constitutional limits of due process. *Cole v. Mileti,* 133 F.3d 433 (6th Cir.1998); *CompuServe v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). Herein, Benham, Thomas and Anderson argue that the ex-

ercise of personal jurisdiction over them is not authorized by Ohio's long-arm statute, Ohio Revised Code § 2307.382, and that to exercise such jurisdiction would offend due process. The Court rejects both contentions.

*First,* Ohio Revised Code § 2307.382(A)(3) permits a court to exercise personal jurisdiction over a non-resident defendant, who acts directly or through an agent to cause "tortious injury by an act or omission in this state." It cannot be questioned that the actions of Benham, Thomas and Anderson (i.e., their activities with respect to the events at the three clinics in mid-July, 1997) occurred in this state. The question is whether they either directly or through their agents caused a tortious injury within Ohio. In its Decision of March 10, 1999, this Court identified trespassing as the tortious activity in which these Defendants allegedly engaged and noted that an injury is presumed to have been suffered whenever a trespass has occurred. *See* Doc. # 97 at 5–8. The Motion for Reconsideration has not convinced this Court that its conclusion in that regard was erroneous. Nevertheless, Benham, Thomas and Anderson argue that it is improper to exercise personal jurisdiction over them, because the Government has not submitted evidence that they trespassed. Accepting that factual assertion for present purposes, the Court does not find it to be the basis for concluding that the exercise of personal jurisdiction over those Defendants is not authorized by § 2307.382(A)(3). That statute provides that a court may exercise jurisdiction over a person who acts directly or through an agent to cause tortious injury within this state. There is ample evidence that those three Defendants directed other protestors to engage in the activity which gave rise to this litigation. Therefore, there is sufficient evidence to find that these Defendants acted through agents to cause trespassing within Ohio.

■ *Second,* the Sixth Circuit has adopted a familiar three-part test to assess

whether exercising personal jurisdiction over a non-resident defendant is compatible with due process:

First, the defendant must purposefully avail himself of the privilege of conducting activities within the forum state; second, the cause of action must arise from the defendant's activities there; and third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make its exercise of jurisdiction over the defendant fundamentally fair. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 794 (6th Cir.1996); *Southern Machine Co. v. Mohasco Industries Inc.*, 401 F.2d 374, 381 (6th Cir.1968).

*Cole*, 133 F.3d at 436. Herein, Benham, Thomas and Anderson focus exclusively upon the first and third elements. In *CompuServe*, the Sixth Circuit elaborated upon the purposeful availment prong of its three-pronged test:

This court has stated that the question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the sine qua non for in personam jurisdiction." [*Southern Machine Co. v. Mohasco Industries Inc.*, 401 F.2d 374, 381–82 (6th Cir.1968) ]. The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *World–Wide Volkswagen [Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Reynolds [v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir.1994), *cert. denied*, 513 U.S. 962, 115 S.Ct. 423, 130

L.Ed.2d 338 (1994) ). Courts require purposeful availment to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.*, 471 U.S. at 475[, 105 S.Ct. 2174] (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774[, 104 S.Ct. 1473, 79 L.Ed.2d 790] (1984)).

89 F.3d at 1263–64. Herein, the evidence is that those three Defendants intentionally and of their own volition came to Ohio and engaged in the activities which are the basis for the Government's claim against them. Thus, Benham, Thomas and Anderson, by their own actions, created a substantial connection with Ohio and should have anticipated being haled into a court in Ohio to answer for the activities in which they engaged, while inside this state. With respect to the third-prong of the Sixth Circuit's three-pronged test, it is fundamentally fair to exercise personal jurisdiction over Benham, Thomas and Anderson in an action in which they have been sued for actions that occurred within Ohio, only a very few miles from the building in which the trial of that litigation will occur.

Accordingly, the Court overrules the Motion for Reconsideration of Benham, Thomas and Anderson (Doc. # 106).

### III. *Alaw's Motion for Admissions (Doc. # 128)*

 Alaw has filed a motion requesting that the Court deem her requests for admission admitted. *See* Doc. # 128. With those requests, she asks that the Government admit that she did not obstruct any individual from entering or leaving either the Cincinnati or the Kettering Clinic. The Government denied those requests for admission, and Alaw now argues that those denials are contrary to the evidence and that, therefore, the Court should order her requests admitted.

Requests for admission are governed by Rule 36(a) of the Federal Rules of Civil

Procedure, which provides in pertinent part:

Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney. If objection is made, the reasons therefor shall be stated. The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny. A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.

The party who has requested the admissions may move to determine the sufficiency of the answers or objections. Unless the court determines that an objection is justified, it shall order that an answer be served. If the court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is ad-mitted or that an amended answer be served. The court may, in lieu of these orders, determine that final disposition of the request be made at a pre-trial conference or at a designated time prior to trial. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

Courts have concluded that the ability to move to determine the sufficiency of answers and objections does not entitle one to request that a court determine the accuracy of a denial. *See Lakehead Pipe Line Co. v. American Home Assurance,* 177 F.R.D. 454, 458 (D.Minn.1997) ("Rule 36(a) does not authorize a Court to [render prospectively] determinations concerning the accuracy of a denial to a Request for Admission, or to order that the subject matter of the request be admitted because the opposing party's unequivocal denial is asserted to be unsupported by the evidence"); *Foretich v. Chung,* 151 F.R.D. 3 (D.D.C.1993). In *Foretich,* Judge Harold Greene noted that an answer to a request for admission is insufficient if it is not specific or the explanation for the refusal to admit or to deny lacks detail, not because a denial may be contrary to the evidence. *Id.* at 5. That judicial officer also noted Fed.R.Civ.P. 37(c) establishes a mechanism, whereby a party who has served requests for admission can, under certain circumstances, recover the expenses it has incurred to prove the matters that the opposing party has refused to admit. This Court finds those decisions to be persuasive and holds that a party may not seek a pre-trial determination of the accuracy of an opponent's denial of a request for admission, merely because the evidence does not support that denial.

Accordingly, the Court overrules Alaw's Motion for Admissions (Doc. # 128).