OPINION OF THE COURT
OAKES, Circuit Judge.
In this case, the United States appeals the decision of the District Court for the District of New Jersey (John C. Lifland, Judge) that the defendants are jointly and severally liable, rather than individually liable, for statutory damages of $5,000 “per violation” of the Freedom of Access to Clinic Entrances Act (“FACE” or “the *256 Act”), 18 U.S.C. § 248 (2000). Several defendants filed cross appeals, arguing that FACE is a violation of Congress’s authority under the U.S. Constitution’s Commerce Clause and of the First Amendment. We conclude that damages under FACE are properly awarded jointly and severally among defendants and that FACE is constitutional. Accordingly, we affirm the district court.

BACKGROUND

On April 18, 1997, the United States, through the United States Attorney General, filed a complaint for injunctive relief and statutory damages against thirty defendants [1] who, the Attorney General alleged, were an ongoing threat to the Metropolitan Medical Associates (“MMA”), a reproductive health clinic in Englewood, New Jersey, its employees and persons seeking reproductive health services at MMA. Specifically, the Attorney General alleged that each defendant participated in one, two, or three protests that obstructed access to MMA in violation of FACE. In the prayer for relief in the Complaint, the Attorney General elected to pursue statutory damages of $5,000 per defendant in lieu of proving actual damages to MMA.
The district court held an evidentiary hearing on July 8-10, 1997, on the Attorney General’s motion for a preliminary injunction. The evidence at the hearing demonstrated that five of the named defendants blocked access to MMA on August 7, 1996, twelve of the named defendants blocked access to MMA on January 18, 1997, and nineteen of the named defendants blocked access to MMA on March 15, 1997. Accordingly, on December 22, 1997, the district court enjoined defendants and their employees, agents, and others acting in concert with them, from blocking and impeding access to MMA, intimidating or attempting to intimidate or interfere with persons seeking access to MMA, and entering or being on MMA premises.
After the preliminary injunction was granted, the parties informed the district court that they disagreed over the proper interpretation of the civil remedies available under FACE. At the district court’s request, the parties submitted briefs addressed to the proper interpretation of statutory damages under FACE. On June 18, 1998, after considering the parties’ pleadings, the district court issued a memorandum wherein, rejecting the Attorney General’s argument that statutory damages should be assessed on each defendant per violation, it concluded that the $5,000 statutory damages were to be assessed per violation and that all defendants who participated in each violation would be held jointly and severally liable for $5,000.
On December 11,1998, the district court granted the Attorney General’s motion for summary judgment and issued a Memorandum and Order Entering Final Judgment. See United States v. Gregg, 32 F.Supp.2d 151 (D.N.J.1998). The district court found that the defendants violated FACE when they conducted the three blockades. See id. at 153-58. The district court determined that Congress intended statutory damages of $5,000 to be assessed per violation and against all responsible persons severally. See id. at 160-61. Accordingly, the defendants were held jointly and severally liable for $5,000 in statutory damages for each violation in which they participated. See id. at 161 (holding five *257 defendants jointly and severally liable for the August 7 blockade, twelve defendants jointly and severally bable for the January 18 blockade, and eighteen defendants jointly and severaby liable for the March 15 blockade).
The Attorney General timely appealed the district court’s decision and eight of the defendants[2] cross appealed. The Attorney General appeals that portion of the district court’s decision that imposed the statutory damages jointly and severally. Defendants do not dispute the district court’s findings that they violated FACE. Rather, Defendants contend that the Attorney General does not, under FACE, have the authority to elect statutory damages in lieu of proof of actual damages. In addition, they argue that FACE is an unconstitutional exercise of Congress’s commerce power and that it violates defendants’ rights guaranteed under the First Amendment of the Constitution.

DISCUSSION

We review the district court’s award of summary judgment de novo. See Figueroa v. Blackburn, 208. F.3d 435, 439 (3d Cir.2000).
I.
The task of resolving how statutory penalties are to be awarded under FACE is a question of statutory interpretation which begins by discerning the plain meaning of FACE’S statutory penalty provision. If Congress’s intent as to this issue is plain, referral to other canons of statutory construction is unnecessary. See Resolution Trust Corp. v. Nemberg, 3 F.3d 62, 64 (3d Cir.1993); Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (“If the intent of Congress is clear, that is the end of the matter[.]”).
To determine a law’s plain meaning, we begin with the language of the statute. See United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); New Rock Asset Partners v. Preferred Entity Advancements, 101 F.3d 1492, 1498 (3d Cir.1996); Santa Fe Medical Services, Inc. v. Segal (In re Segal), 57 F.3d 342, 345 (3d Cir.1995). If the language of the statute expresses Congress’s intent with sufficient precision, the inquiry ends there and the statute Is enforced according to its terms. See Ron Pair Enterprises, Inc., 489 U.S. at 241, 109 S.Ct. 1026. Where the statutory language does 'not express Congress’s intent unequivocally, a court traditionaby refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose. See New Rock, 101 F.3d at 1498. Once the plain meaning of the statute is determined, it is conclusive “except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.” Id. (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)).
Section 248(a) of FACE, in relevant part, provides:
(a) Prohibited Activities. — Whoever—
(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates, or interferes with or attempts to injure, intimidate, or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services
shall be subject to the ... civil remedies provided in subsection (c)
*258 18 U.S.C. § 248(a)(2000). FACE further prohibits the intentional damage or destruction of a facility because it provides reproductive health services. See id. Any person aggrieved by the foregoing actions may bring a civil action for relief. See 18 U.S.C. § 248(a)(1)(A) (2000).
In any action under FACE, a person aggrieved by conduct prohibited under the Act, may obtain “temporary, preliminary or permanent injunctive relief and compensatory and punitive damages.” 18 U.S.C. § 248(c)(1)(B) (2000). In addition, FACE allows a plaintiff in a civil action to elect, “in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.” 18 U.S.C. § 248(c)(1)(B) (2000). The Act permits the U.S. Attorney General and state attorneys general to bring civil actions for the same relief if they believe that a person or group of persons has been aggrieved by violations of the Act. See 18 U.S.C. §§ 248(c)(2), (3) (2000); H.R.Rep. No. 103-306, at 13 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 710. In civil actions brought by an attorney general,
The court, to vindicate the public interest, may also assess a civil penalty against each respondent-
(i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and
(ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000 for any other subsequent violation.
18 U.S.C. § 248(c)(2)(B) (2000).
The Attorney General argues that the district court incorrectly awarded statutory damages per violation presumably to be shared by the defendants involved with each blockade and contends that FACE and its goals require statutory damages to be awarded $5,000 per defendant. We agree with the district court that the “dichotomy of expression” between the civil remedy provisions of FACE demonstrates Congress’s intent that statutory damages be imposed per violation and jointly and severally among the defendants who participated in the blockade. Gregg, 32 F.Supp.2d at 160; see also Milwaukee Women’s Medical Services, Inc. v. Brock, 2 F.Supp.2d 1172, 1178 (E.D.Wis.1998) (awarding statutory damages per violation rather than per defendant); Greenhut v. Hand, 996 F.Supp. 372, 379 (D.N.J.1998) (same); Planned Parenthood of Southeastern Pennsylvania, Inc. v. Walton, 1998 WL 88373 at *1-2 (E.D.Penn. Feb. 12, 1998) (same).
In authorizing compensatory statutory damages of $5,000 in lieu of actual damages, Congress uses the phrase “per violation.” 18 U.S.C. § 248(c)(1)(B). This is in sharp contrast to the language used in the provision permitting courts to assess substantial civil penalties to vindicate the public interest in cases brought by attorneys general. See 18 U.S.C. § 248(c)(2)(B). In § 248(c)(2)(B), an attorney general can request civil penalties of up to $25,000 “against each respondent.” Id. The language of § 248(c)(2)(B) illustrates that Congress knew how to explicitly instruct a court to assess damages per defendant rather than per violation. The absence of analogous “per respondent” language in § 248(c)(1)(B) and the use instead of the phrase “per violation” indicates that Congress carefully considered the issue and decided that compensatory statutory damages will be imposed per violation, a manner that' differs from the civil penalties imposed to vindicate the public interest.
We disagree with the Attorney General that the use of “whoever” in § 248(a) means that compensatory statutory penalties are to be imposed individually. Section 248(a) defines the substantive liability under FACE. It does not address how, under the Act, civil compensatory damages are to be awarded. The use of the singular in that provision thus does not overcome the specific “per violation” language in the relevant remedy provision of the Act. Thus, the statutory language indicates that Congress intended that compensatory *259 statutory damages, like those imposed in this case, are awarded per violation, presumably to be shared jointly and severally among the defendants who participated in the violation.
This interpretation is consistent with FACE’S legislative history and the atmosphere of anti-abortion violence in which FACE was enacted. FACE was enacted in 1994 against a backdrop of escalating violence directed toward reproductive health clinics, their employees, and patients. Both the House and Senate Reports set forth detailed accounts of the virulent national campaign waged by antiabortion activists. See H.R.Rep. No. 103-306, U.S.C.C.A.N., at 699. The evidence before Congress demonstrated that “this campaign of violence has lead to death, injury, harassment, fear, and thousands of arrests all across the nation.” H.R.Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. Congress also set forth findings that state and local authorities had proved inadequate, and sometimes unwilling, to curb the violence. See S.Rep. No. 103-117, at 17-18 (1993); H.R.Rep. No. 103-306, at 6, 10, U.S.C.C.A.N., at 703, 707 (“state and local enforcement authorities have failed to address effectively the systematic and nationwide assault that is being waged against health care providers and patients.”). Consequently, Congress enacted FACE with substantial federal remedies to prevent the “use of blockades, violence and other forceful or threatening tactics against medical facilities and health care personnel who provide abortion-related services....” S.Rep. No. 103-117, at 2. In sum, FACE serves two important goals: First, federal remedies help compensate individuals and health care facilities for the harm caused by blockades and, second, they serve to deter protesters from repeatedly violating the law.
The Attorney General argues that Congress intended statutory damages to be assessed per individual so that punishment would be imposed with the result of deterring defendants from violating FACE in the future. We agree with the Attorney General that deterrence is a primary goal of substantial federal penalties against clinic blockaders. This goal is well served by the availability of criminal sanctions, punitive damages, and civil penalties. See 18 U.S.C. §§ 248(b), (c). Congress explained, however, that the statutory penalties described in § 248(c)(1)(B) are available “in lieu of actual damages.” According to the Senate Report, they were included to ease the often difficult task of proving actual loss in a case where anti-abortionists’ tactics close a clinic temporarily or interfere with a person’s access to reproductive health services. The senate report stated that statutory damages were included “[bjecause of the expense and other difficulties of proving actual damages (for example, a clinic’s lost income).” S.Rep. No. 103-117 at 26. Accordingly, the statutory penalties elected by the Attorney General in this case were included with the goal of compensating the victims of the misconduct prohibited by FACE. As the district court noted “[o]ne person can just as effectively injure, interfere with, or intimidate as can a group, depending on the circumstances.” Gregg, 32 F.Supp.2d at 160. Damages to compensate thus have no bearing on how many individuals caused the damage. Because the legislative history of FACE indicates that the purpose of the statutory damages is to compensate, it follows that Congress intended that compensatory statutory damages be awarded per violation regardless of how many people participated in the misconduct.
Finally, the Attorney General argues that joint and several liability among defendants encourages individuals to engage in large, rather than small, blockades. With joint and several liability, the Attorney General contends, the total damages award “per violation” remains the same, yet the more persons who violate the law, the smaller the amount each defendant must pay, thus perversely tending to encourage, rather than discourage, defen *260 dants to organize blockades using greater, rather than smaller, groups of people.
We are not convinced that awarding compensatory statutory penalties per violation rather than per defendant will cause defendants strategically to recruit more defendants for each violation. Because of the wide variety of remedies available under FACE, clinic blockaders will not know the penalties that they face for their misconduct and be able to plan accordingly. They will not know before the suit is filed whether an Attorney General or private plaintiff will opt for statutory damages in lieu of actual damages. See 18 U.S.C. § 248(c)(1)(B). They will also not know if they will be made subjects of a criminal prosecution and face criminal fines. See 18 U.S.C. § 248(b). Furthermore, in the case where an attorney general brings a civil action, he or she has the option of requesting that the court assess a civil penalty against each defendant in an amount as great as $25,000 in an appropriate case. See 18 U.S.C. § 248(c)(2)(B). Moreover, joint and several liability does not solely contemplate a group of liable defendants sharing the award among them. A liability is joint and several when “the creditor may sue one or more of the parties to such liability separately, or all of them together, at his [or her] option.” Black’s Law Dictionary 751 (5th ed.1979). It is thus highly unlikely that a defendant or group of defendants would plan a clinic blockade or other violation of the Act in light of the penalty provisions under the Act. Because of the varying ways penalties under the Act may be assessed against a group of defendants involved in one violation, we are not convinced that the deterrent value of FACE is compromised by awarding the compensatory statutory damages jointly and severally as the Act plainly provides that they should be.
In sum, we conclude that Congress intended FACE’S compensatory statutory damages be awarded per violation and jointly and severally among defendants. We base our conclusion primarily on Congress’s use of “per violation” language in § 248(c)(1)(B) as opposed to the “per respondent” phrase in § 248(c)(2)(B). Furthermore, because Congress made statutory penalties available principally to ease the plaintiffs burden of proving actual damages and other penalties to deter the misconduct prohibited by FACE are available, the $5,000 statutory damages are awarded per violation and jointly and severally among the participating defendants.
II.
Defendants argue that the Attorney General may not elect statutory damages in lieu of actual damages. Their argument misapprehends the statute and is belied by the Act’s legislative history. Under FACE, the Attorney General of the United States and a state attorney general may commence a civil action against an individual or individuals who engage in the conduct prohibited by the Act. See 18 U.S.C. § 248(c)(2). The Act provides that in an action initiated by an attorney general, “the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B).” 18 U.S.C. § 248(c)(2)(B) (emphasis added). Defendants contend that the phrase “compensatory damages” as used in § 248(c)(2)(B) refers only to actual damages and not to statutory damages. However, § 248(c)(1)(B) defines compensatory damages as actual and statutory damages. See 18 U.S.C. § 248(c)(1)(B). Thus, by using the term “compensatory damages” in § 248(c)(2)(B), Congress plainly meant to incorporate all of the text relevant to compensatory damages as set • out in § 248(c)(1)(B). Therefore, the phrase “compensatory damages” as used in § 248(c)(2)(B) authorizes the attorney general to elect an award of statutory damages.
Furthermore, the legislative history demonstrates that Congress intended that statutory damages be awarded in a civil *261 action initiated by an attorney general. The House confirmed that “[t]he Act authorizes the U.S. Attorney General and State Attorneys General to bring civil causes of action on behalf of aggrieved persons for the same relief available in private actions; however, fees for attorney and expert witnesses may not be awarded to the United States.” H.R.Rep. No. 103-106, at 3, U.S.C.C.A.N., at 700 (emphasis added). Because the relief available in private actions includes statutory damages and Congress intended that an attorney general be entitled to the same relief as a private party, we reject the defendants’ position that the Attorney General may not elect statutory damages in this case.
III.
A. Commerce Clause.
We now turn to the question whether FACE falls within Congress’s power under Article I, § 8 of the United States Constitution. The Commerce-Clause empowers Congress to “regulate Commerce ... among the several states.” U.S. Const., Art. I, § 8, cl. 3. Whether FACE is a proper exercise of Congress’s commerce power has been much discussed in published opinions of United States Courts of Appeals. Indeed, this is one of the last federal appellate tribunals to address the issue. After considering most, if not all, of the arguments presented by the defendants in this case, these courts held that FACE is valid under the Commerce Clause. See United States v. Hart, 212 F.3d 1067, 1074 (8th Cir.2000); United States v. Weslin, 156 F.3d 292, 296 (2d Cir.1998), cert. denied, 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999); Hoffman v. Hunt, 126 F.3d 575, 582-88 (4th Cir.1997), cert. denied, 523 U.S. 1136, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); United States v. Bird, 124 F.3d 667, 672-82 (5th Cir.1997), cert. denied, 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998); Terry v. Reno, 101 F.3d 1412, 1415-18 (D.C.Cir.1996), cert. denied, 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); United States v. Soderna, 82 F.3d 1370, 1373-74 (7th Cir.), cert. denied, 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); United States v. Dinwiddie, 76 F.3d 913, 919-21 (8th Cir.), cert. denied, 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); United States v. Wilson, 73 F.3d 675, 679-88 (7th Cir.1995), cert. denied, 519 U.S. 806, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996); Cheffer v. Reno, 55 F.3d 1517, 1519-22 (11th Cir.1995). Today, this Circuit aligns with the decisions of its sister courts of appeals and holds that FACE is a proper exercise of Congress’s Commerce Clause power.
In United States v. Lopez, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), a decision aptly described by this Court as changing the Commerce Clause landscape, see United States v. Parker, 108 F.3d 28, 29 (3d Cir.1997), the Supreme Court identified three broad categories of activity that Congress may regulate under its commerce power. Congress may: 1) “regulate the use of the channels of interstate commerce,” Lopez, 514 U.S. at 558, 115 S.Ct. 1624 (citations omitted); 2) “regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce even though the threat may come only from intrastate activity,” Id. (citations omitted); and 3) “regulate those activities having a substantial relation to interstate commerce ... i.e., those activities that substantially affect interstate commerce.” Id. at 558-559, 115 S.Ct. 1624 (citations omitted).
Although the judicial branch is the final arbiter of the constitutionality of a statute, courts review a congressional determination that it had the power to enact a particular piece of legislation with substantial deference. See Parker, 108 F.3d at 30; United States v. Bishop, 66 F.3d 569, 576-77 (3d Cir.1995). It is not our job to “second-guess the legislative judgment of Congress” that blockades and violence directed at reproductive health clinics can *262 be regulated under the Commerce Clause power but, rather, to ensure that Congress had a rational basis for that conclusion. Parker, 108 F.3d at 30 (quoting Bishop, 66 F.3d at 577). We hold that under Lopez and this Circuit’s precedent, FACE is a proper exercise of Congress’s power to regulate intrastate conduct that, in the aggregate, has a substantial effect on interstate commerce.[3]
In United States v. Morrison, — U.S. -, 120 S.Ct. 1740, 1749-52, 146 L.Ed.2d 658 (2000), the Supreme Court’s most recent communique on Lopez’s third category of regulation, the Court provided a framework to determine whether a law regulates an activity that has a substantial effect on interstate commerce. The Court identified four relevant considerations. These are: 1) the economic nature of the regulated activity, see id. at-, 120 S.Ct. at 1750; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce, see id. at-, 120 S.Ct. at 1750-51; 3) express congressional findings regarding the effects upon interstate commerce of the activity in question, see id. at-, 120 S.Ct. at 1751; and 4) the link between the regulated activity and interstate commerce, see id. at-, 120 S.Ct. at 1751.
Morrison first asks a court to consider whether the federal law regulates intrastate economic or commercial activity. See id. at -, 120 S.Ct. at 1750. In Morrison, the Supreme Court noted, “In every case where we have sustained federal regulation under Wickard’s aggregation principle, the regulated activity was of an apparent commercial character.” Id. Accordingly, in Morrison, the Supreme Court invalidated the civil remedy provision of the Violence Against Women Act (“VAWA”), in part, because gender-motivated crimes “are not in any sense of the phrase, economic activity.” Id. at -, 120 S.Ct. at 1751. In contrast to gender-motivated crime, the activity regulated by FACE — the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services — is activity with an effect that is economic in nature. Reproductive health clinics are income-generating businesses that employ physicians and other staff to provide services and goods to their patients. Motivated by anti-abortion sentiment, the primary goal of individuals and groups engaged in the misconduct prohibited by FACE is to temporarily and permanently interrupt the operations of reproductive health facilities and prevent individuals from accessing their services. See S.Rep. No. 103-117, at 11; H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the violent and obstructive acts directed at reproductive health facilities had caused millions of dollars of damage and forced clinics to close, caused serious and harmful delays in the provision of medical services and intimidated a number of physicians from offering abortion services. See S.Rep. No. 103-117, at 14; H.R.Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The effect of the conduct proscribed by FACE is to deter, and in some eases to stop completely, the commercial activity of providing reproductive health services. We thus hold that although the connection to economic or commercial activity plays a central role in whether a law is valid under the Commerce Clause, we hold that economic activity can be understood in broad terms. Pursuant to this principle, unlike the activity prohibited by VAWA, the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic. See Weslin, 156 F.3d at 296 (threats of violence that have the effect of deterring *263 commercial activity is properly regulated under commerce clause); Hoffman, 126 F.3d at 587 (activity regulated by FACE, while not itself economic or commercial, “is closely and directly connected with an economic activity ... therefore ... we cannot conclude that FACE has nothing to do with commerce or any sort of economic enterprise”); Dinwiddie, 76 F.3d at 921 (“FACE prohibits interference with a commercial activity — the provision and receipt of reproductive health services.”); Cheffer, 55 F.3d at 1520 (“the Access Act does regulate commercial activity, the provision of reproductive health services.”).
Morrison next instructs a court to consider the existence of a jurisdictional element. — U.S. at-, 120 S.Ct. at 1750-51. “A jurisdictional element ... refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute.” United States v. Rodia, 194 F.3d 465, 471 (3d Cir.1999), cert. denied, — U.S. -, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). FACE does not contain an explicit jurisdictional element establishing that the federal cause of action is in pursuance of Congress’s power to regulate interstate commerce. Although such an element would certainly lend support to the conclusion that FACE is tied to interstate commerce, we conclude that it was not necessary for Congress explicitly to limit the civil remedy provision in the case of regulating anti-abortion activity directed at reproductive health clinics that are, by definition, directly engaged in the business of providing reproductive health services. See Bird, 124 F.3d at 675 (reasoning that a jurisdictional element is “not always a necessary” method to ensure that Congress does not exceed its commerce power).
Morrison also directs that the existence of congressional findings on the burden of the regulated activity on interstate commerce “may enable [a court] to evaluate the legislative judgment that the activity in question substantially affects interstate commerce.” Morrison, — U.S. at-, 120 S.Ct. at 1752 (quoting Lopez, 514 U.S. at 563,115 S.Ct. 1624). Congress’s conclusion that the activity proscribed by FACE burdens interstate commerce is a conclusion derived from months of legislative hearings, research, and debate. The Senate Judiciary Committee and the House Committee on Labor and Human Resources which considered the legislation before it became law submitted extensive reports on the necessity of FACE. See Bird, 124 F.3d at 678. Thus, Congress’s conclusion that FACE is constitutional is entitled to judicial deference. See Parker, 108 F.3d at 29.
Finally, in accordance with the fourth factor of Morrison, the findings set forth in the House and Senate Committee Reports demonstrate that Congress had a rational basis upon which to conclude that the activities governed by FACE have a substantial effect on interstate commerce. As set out in detail below, the findings show that a national market for abortion-related services exists in this country and that reproductive health clinics are directly engaged in interstate commerce. The findings further demonstrate that a national movement engaged in the activities proscribed by FACE has decreased the availability of abortion-related services in the national market and caused women seeking services and physicians providing services to travel interstate. Accordingly, the activity proscribed by FACE has a substantial effect on the interstate commerce of reproductive health services.
The legislative record establishes that a shortage of abortion-related services exists in this country that is exacerbated by the misconduct proscribed by FACE. See S.Rep. No. 103-117, at 17. Only 17 percent of counties in the United States have an abortion provider. See H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. This leaves 83 percent of counties without a physician willing to perform abortions. See S.Rep. No. 103-117, at 17 & n. 29. The *264 shortage is most severe in rural counties because reproductive health clinics are located primarily in metropolitan areas, leaving women residing in rural areas without a provider of these services. See H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. In a rural community, only one provider usually exists in a large geographical area, thus making it a preferred target for antiabortionists because elimination of ■ that provider eliminates abortion services for all women in that area. See H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.
The shortage of abortion-related services has resulted in a national market for these services because many of the patients must engage in interstate commerce by traveling from one state to obtain reproductive health services in another. Testimony and evidence before Congress showed that substantial numbers of women travel interstate to seek the services of reproductive health clinics. See S.Rep. No. 103-117, at 31; H.R.Rep. No. 103-603, at 6, U.S.C.C.A.N., at 703. Many patients travel over 100 miles to their appointments. See S.Rep. No. 103-117, at 17 & n. 29. For one example, Ms. Sylvia Doe, who testified before Congress that after learning her baby suffered from a permanent disability that would cause its early death, traveled from Virginia to a clinic in Kansas capable of performing the procedure she required. See H.R.Rep. No. 103-306, at 7-8, U.S.C.C.A.N., at 704-05. Furthermore, the Senate found that 44 percent of the patients treated at a clinic in Wichita, KS, are from out of state. See S.Rep. No. 103-117, at 31. Congress’s determination that reproductive health services are an interstate market was well supported by the testimony presented to the committees. See Bird, 124 F.3d at 668-79. (setting forth a summary of testimony).
In addition, reproductive health clinics employ a national market of physicians and staff. Because of the shortage of physicians willing to perform abortions in the age of clinic violence, doctors employed at reproductive health clinics often travel across state lines to provide abortion services. See S.Rep. No. 103-117, at 31 & n. 46. “Some doctors traveled to several states, some for hundreds of miles, to perform abortions at clinics which had no physicians of their own.” Id. For example, in South Dakota the only physician who performs abortions commutes from Minnesota and provides abortion services in Minnesota, Montana, North Dakota, and parts of Canada. See id. at 16-17 & n. 29, 31.
The Senate Committee also concluded that reproductive health clinics engage in interstate commerce. The Committee reported that
Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the stream of interstate commerce.
5.Rep. No. 103-117, at 31. Thus, Congress found that a national market existed for reproductive health services because of the shortage of physicians who provide abortion-related services, that reproductive health clinics often employ physicians from outside the state in which they are located, and reproductive health clinics themselves are engaged in interstate commerce.
Finally, Congress determined that the conduct prohibited by FACE inhibits and prohibits the delivery of reproductive health care services in the national market. Based on the testimony and evidence before it, Congress found that the clinic blockades, the threats against employees, and the other violent and obstructive activities prohibited by FACE have the single goal of eliminating the practice of abortion by closing abortion clinics. See S.Rep. No. 103-117, at 11; H.R.Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. Congress also, *265 based on the evidence before it, rationally determined that the national movement was succeeding. The House Report stated that the “campaign of violence has led to death, injury, harassment, fear, and thousands of arrests all across the nation. It has resulted, as intended, in access to the constitutionally protected right to choose being denied to thousands of women nationwide against their will.” H.R.Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. The Senate Report states that clinic blockades and violent protests proscribed by the Act have “a significant adverse impact not only on abortion patients and providers, but also on the delivery of a wide range of health care services.” S.Rep. No. 103-117, at 14. The effect of the violence forced “clinics to close, caused serious and harmful delays in the provision of medical services, and increased health risks to patients.” Id.
Furthermore, when FACE was enacted, millions of dollars of .damage had been caused to these facilities by the clinic blockades. See H.R.Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The damage caused to reproductive health care facilities eliminates on a temporary or permanent basis the reproductive health care services that are provided by the facilities. See id. at 9, U.S.C.C.A.N., at 706. Thus, the activities proscribed by FACE inhibit the operation of entities that are directly engaged in interstate commerce.
Congress explicitly noted the link between the abortion-related violence and the shortage of physicians willing to perform abortions. A number of physicians and health care personnel have been intimidated by the threats of violence made to them and their families and have stopped providing their services, thus contributing to the shortage of providers. The House Committee found that rural clinics and doctors have become the preferred targets for abortion foes because elimination of that single provider effectively eliminates service for many women. See id. at 8, U.S.C.C.A.N., at 705. The Senate Committee also reported that the violence “has ... taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers.” S.Rep. No. 103-117, at 14. Specifically, “some providers have succumbed to the intimidation and threats.” Id. at 17. At least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group, two doctors stopped working in 1993 after receiving death threats, and since Dr. Gunn, an abortion-provider in Florida, was shot in 1993, at least eight more doctors have stopped offering abortion services. See id. at 16-17. The House Committee also reported that the shortage of abortion providers is “at least partially attributable to the violence and intimidation described in this report. Doctors understandably are leaving the field, and new graduate^] have little desire to enter the field even as part of a wider obstetrics/gynecology practice.” H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.
Moreover, although under Lopez Congress may regulate intrastate activity that in the aggregate has an effect on interstate commerce, the anti-abortion movement itself whose conduct is regulated by FACE is national in scope. Congress found that many of the activities were organized and directed across state lines. See S.Rep. No. 103-117, at 13, 14 & n. 26; H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. The House reported that a national strategy has emerged, orchestrated by anti-abortion leaders. See H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the conduct regulated by FACE was beyond the control of local and state authorities. Thus, when it enacted FACE, Congress sought to regulate a truly national problem.
In sum, due to the acute shortage of abortion-related services in this country and the resulting national market for abortion-related services, the conduct proscribed by FACE — the commission of *266 blockades and other acts of violence — has a substantial effect on the availability in interstate commerce of reproductive health services. The effect of the misconduct is to deter physicians from providing further services and temporarily and permanently to shut down reproductive health clinics, thus forcing large -numbers of women to travel across state lines to obtain services. We, thus, must agree with the testimony before the Senate that,
the shift of demand for abortion services from those areas where clinic access is obstructed to those areas where it is not represents the sort of interstate commerce effect that is beyond the effective control of any one state and is accordingly a proper subject for congressional regulation under the Commerce Clause.
Bird, 124 F.3d at 681 (quoting Senate Hearings, at 97 (statement of Professor Tribe)).[4]
Our determination that FACE regulates activity that has a substantial effect on interstate commerce is supported by Supreme Court cases young and old. Recently, in Jones v. United States, — U.S. -, 120 S.Ct. 1904, 1909, 146 L.Ed.2d 902 (2000), the Supreme Court considered whether the arson of an owner-occupied residence not used for any commercial purposes qualified as arson of property used in interstate commerce within the meaning of the federal arson statute. The Court held that arson of a private dwelling was beyond the reach of federal commerce power to criminalize arson. See id. at -, 120 S.Ct. at 1911. To determine, however, whether the arson of a particular facility is a commerce-affecting act, the Court instructed that “[t]he proper inquiry ... is into the function of the building itself, and then a determination of whether that function affects interstate commerce.” Id. at-, 120 S.Ct. at 1910. Here, the facilities blockaded and temporarily or permanently closed by the activities of antiabortion protestors are businesses that provide reproductive health services and are directly involved in interstate commerce. Thus, under the functionality test provided in Jones, the blockading and destruction of reproductive health clinics, just like the arson of a commercial building, is a commerce-affecting activity and therefore properly regulated by Congress.
In Atlanta Motel v. United States, 379 U.S. 241, 250-58, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), the Supreme Court upheld Title II of the Civil Rights Act of 1964 as a proper regulation of an activity that affects commerce. The holding was premised on the conclusion that discrimination in restaurants results in serving fewer customers, therefore adversely affecting interstate commerce. Here, given Congress’s specific findings that there exists a nation *267 al market for reproductive health services suffering from a shortage in services, the effect of temporarily and permanently shutting down reproductive health clinics that are often frequented and staffed by people crossing state lines has a direct effect on interstate commerce under the reasoning presented in Atlanta Motel.
In sum, we conclude that the activity regulated by FACE is economic in nature. We further determine that due to the national nature of reproductive health services and anti-abortion protests, the civil penalty provision is within the boundaries of Congress’s power to regulate interstate commerce. Applying the deference that is due Congress’s findings, see Parker, 108 F.3d at 30-31, we further conclude that, unlike the statutes reviewed in Lopez and Morrison, FACE regulates conduct that Congress had a rational basis to conclude has a direct and substantial effect on interstate commerce. We hold, therefore, that FACE falls within the scope of congressional authority under the Commerce Clause as a legitimate regulation of activity having a substantial effect on interstate commerce.
B. First Amendment.
Finally, we join the decisions of the courts of appeals that FACE does not regulate speech and expression protected by the First Amendment. See Hart, 212 F.3d at 1071-73; United States v. Balint, 201 F.3d 928, 934-36 (7th Cir.2000); Weslin, 156 F.3d at 296-98; United States v. Wilson, 154 F.3d 658, 662-64 (7th Cir.1998), cert. denied, 525 U.S. 1081, 119 S.Ct. 824, 142 L.Ed.2d 681 (1999); Hoffman, 126 F.3d at 588-89; Bird, 124 F.3d at 683-84; Terry, 101 F.3d at 1418-22; Soderna, 82 F.3d at 1374-77; Dinwiddle, 76 F.3d at 921-24; Cheffer, 55 F.3d at 1521-22. These courts have thoroughly addressed the arguments presented by Defendants in this case and we are in full agreement with their decisions. For this reason, we do not expound on our analysis of these claims.
Defendants first argue that FACE is a view-point based restriction on speech and expressive conduct that is protected under the First Amendment. FACE is not viewpoint based. The language of the statute and the legislative history demonstrates that FACE governs all individuals and groups that obstruct the provision of reproductive health services and religious worship. The purpose of FACE was to protect clinics, their staff, and patients from the harm suffered when their right to provide and receive reproductive health services was interfered with. The law applies equally to all who interfere with the provision of these services, regardless of the motivation for the conduct. See Weslin, 156 F.3d at 296-97; Dinwiddie, 76 F.3d at 923; see also Pro-Choice Network of Western New York v. Schenck, 67 F.3d 377, 386 (2d Cir.1995) (en banc), aff'd. in part, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (holding that because the purpose of an injunction enjoining a group of anti-abortion protestors was to prevent the harm that prospective patients would suffer if the anti-abortionists’ activities continued, the injunction was content neutral). Thus, Congress did not pass FACE because of disagreement with the message of anti-abortionists. Accord Hill v. Colorado, — U.S. -, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (holding Colorado law that makes it unlawful for any person within 100 feet of a health care facility’s entrance to knowingly approach within eight feet of another person without that person’s consent is a content-neutral restriction). Because FACE prohibits conduct regardless of the view-point of the actor, FACE does not discriminate on the basis of content.
Furthermore, FACE, which is viewpoint neutral, governs conduct not speech. See Terry, 101 F.3d at 1418-19; Hoffman, 126 F.3d at 588; Cheffer, 55 F.3d at 1521. By its very terms, FACE regulates “force,” “threat[s] of force,” or “physical obstruction.” 18 U.S.C. § 248(a). Activities that injure, threaten, or obstruct are not protected by the First Amendment, *268 whether or not such conduct communicates a message. See Wilson, 154 F.3d at 663; Terry, 101 F.3d at 1418-19. ■ Although the conduct may have “expressive components,” this does not exempt it from governmental prohibition. Weslin, 156 F.3d at 297. We hold that FACE is a valid restriction of conduct that has an expressive component under the three-part test in United States v. O’Brien, 391 U.S. 367, 376-82, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). FACE serves the important governmental interest in ensuring public safety and a woman’s right to seek reproductive health services; this interest is unrelated to the suppression of free speech; and FACE is narrowly tailored to meet these ends. See Weslin, 156 F.3d at 297-98; Terry, 101 F.3d at 1419-20. FACE is therefore constitutional under O’Brien. Accordingly, we hold that FACE is constitutional under the First Amendment.[5]

CONCLUSION

Therefore, we conclude that compensatory statutory damages under FACE are properly awarded per violation and jointly and severally among defendants who participated in the violation. Furthermore, we join our sister circuits and hold that FACE is a constitutional exercise of Congress’s commerce power and does not violate the First Amendment. The District Court is affirmed.

. The defendants named in the complaint are Joseph R. Gregg, Ruby C. McDaniel, Luis Menchaca, Francis S. Pagnanelli, William Charles Raiser, Michael Henry, Rose Kidd, Arnold Matheson, Katharine O'Keefe, Eva Alvarado, Joseph Roach, Robert Rudnick, James Soderna, James Sweatt, Elizabeth Wagi, Byron Adams, Kevin Blake, Amy Bois-sonneault, Baldo Dino, Stephen C. Elliot, Sheryl Fitzpatrick, Mary Foley, Dennis Green, George Lynch, Raymond Micco, Alexis Mulre-nan, Ralph Traphagen, James Trott, and Ki-miko Trott. The Attorney General dismissed the charges against Mary Foley and her name has been removed from the caption. They will be referred to in this opinion collectively as "the defendants” unless it is necessary to provide names.

. Rose Kidd, James Sweatt, Elizabeth Wagi, Raymond Micco, William Raiser, James So-derna, and Keven Blake filed a cross appeal on February 18, 1999. Francis S. Pagnanelli filed a separate cross appeal on February 18, 1999. Their arguments were consolidated in one appellate brief.

. Because we determine that FACE is a proper regulation of intrastate activity that has a substantial effect on interstate commerce, we do not reach the Attorney General’s argument that FACE is also a proper regulation of in-strumentalities in commerce.

. We respectfully register our disagreement with the dissent. The dissent characterizes the connection between clinic blockades and interstate commerce as the same attenuated “but-for-causal chain” between gender-motivated crimes and interstate commerce rejected by the Court in Morrison. This view narrowly focuses on the activity regulated by FACE in the abstract and fails to acknowledge the national market for reproductive health services in this country. Congress determined that the abortion provider shortage in the United States has resulted in a national market for abortion services. In this context, abortion-related violence committed to close down a reproductive health clinic or deter a woman from accessing its services has a direct effect on interstate commerce. Abortion-related violence in the specific context of a national market for reproductive services simply cannot be compared to gender-motivated , crime — the activity regulated by VAWA. Given the national market for abortion services, the nexus between the activity regulated by FACE and interstate commerce is direct.
The dissent also relies on a comparison of anti-abortion violence to rape, robbery, and trespass to conclude that anti-abortion violence is a local problem properly regulated by the anti-abortion movement. This comparison fails to acknowledge the motivation of the anti-abortion movement. Although the individual tactics of anti-abortion activists may have similar characteristics as common law crimes, the comparison ends there. As Congress found, the anti-abortion movement targets specifically a branch of commerce that operates in a national market. Hence, antiabortion violence is a national, rather than a local, problem.

. Defendants also argue that because the Attorney General described the actions of lawful protesters in its appellate brief, FACE, as applied in this case, is unconstitutionally vague and overbroad. This argument is without merit.